315 Ga. 661
FINAL COPY

S22A1303. GONZALES v. THE STATE.

BOGGS, Chief Justice.

Appellant Robert Michael Gonzales challenges his convictions for aggravated battery and felony murder, predicated on cruelty to children in the first degree, in connection with the death of three-year-old Samuel Carroll, the son of Appellant's girlfriend Jocelyn Carroll. Appellant contends that the evidence was legally insufficient to support his convictions. We conclude that the evidence presented at trial was legally sufficient to support Appellant's convictions as a matter of constitutional due process. However, we vacate Appellant's sentence for aggravated battery because this count should have merged with the felony murder conviction under these particular facts. Thus, we affirm in part and vacate in part.[1]

---

[1] The crimes occurred on February 27, 2011. On May 20, 2011, a Liberty

1. "It is incumbent upon the Court to question its jurisdiction in all cases in which jurisdiction may be in doubt." *Woods v. State*, 279 Ga. 28, 28 (608 SE2d 631) (2005). The jurisdictional question presented here is whether the judgment below is final and thus appealable under OCGA § 5-6-34 (a) (1) (appeals may be taken from "final judgments"). As set forth in footnote 1, at the time Appellant filed his notice of appeal, two counts alleging cruelty to children

County grand jury indicted Appellant for malice murder, felony murder (predicated on cruelty to children in the first degree), aggravated battery, and three counts of cruelty to children in the first degree. The child cruelty count underlying the felony murder count alleged that Appellant caused Samuel cruel and excessive physical and mental pain by inflicting severe blunt force trauma to his head. The other two child cruelty counts (Counts 5 and 6) were based on Appellant's interactions with Samuel on two occasions prior to February 27, 2011, in which he "taunt[ed]" and "terroriz[ed]" Samuel. At a trial on September 18 and 19, 2012, the jury found Appellant not guilty of malice murder and guilty of all the other charges. The trial court sentenced Appellant to serve life in prison with the possibility of parole for felony murder, a consecutive 20-year term for aggravated battery, and two concurrent 20-year terms for the child cruelty counts charged in Counts 5 and 6. The third child cruelty count merged with the felony murder count. On October 2, 2012, Appellant filed a motion for new trial, which he amended with new counsel on August 14, 2019. On April 14, 2022, the trial court entered an order granting the motion for new trial as to Counts 5 and 6, on the basis that the jury should have been given an instruction on a lesser-included offense as to those counts. The trial court otherwise denied the motion. Appellant filed a timely notice of appeal on May 12, 2022. On May 16, 2022, the trial court granted the State's motion to dismiss Counts 5 and 6, and on July 22, 2022, the case was docketed in this Court to the August 2022 term and submitted for a decision on the briefs.

remained pending below because the trial court had granted Appellant's motion for new trial as to those counts. But shortly thereafter, the trial court granted the State's motion to dismiss the two pending counts.[2] After the State filed a motion to dismiss the appeal under *Seals v. State*, 311 Ga. 739, 742 (860 SE2d 419) (2021) (a criminal case is not final and appealable until the trial court "enters a written judgment on each count of the indictment"), we requested supplemental briefs from the parties addressing whether the supersedeas effect of the notice of appeal deprived the trial court of jurisdiction to enter the dismissal order, and if not, whether the notice of appeal ripened so as to vest jurisdiction in this Court. We also invited amicus briefs on this issue.[3] The parties and amici now contend that the appeal is properly before the Court, and we agree.

---

[2] The trial court's dismissal order here was entered in the same term of court as the order granting the new trial. See OCGA § 15-6-3 (4) (c) (providing that the terms of court for the Superior Court of Liberty County commence on the second Monday in February and September). See *Kelly v. State*, 315 Ga. 444, 447-448 (883 SE2d 363) (2023) (discussing trial court's authority to alter judgment outside of the term of court in which the judgment was entered).

[3] We appreciate the helpful contributions to our consideration of this case from amici the Georgia Association of Criminal Defense Lawyers and the Georgia Public Defender Council.

(a) When the trial court granted Appellant's motion for new trial in part, it did so because of an instructional error, not insufficiency of the evidence. Thus, at the time Appellant filed his notice of appeal, the two counts of child cruelty remained pending, such that the convictions for felony murder and aggravated battery did not constitute a final, appealable judgment. See *Jenkins v. State*, 294 Ga. 506, 509 (755 SE2d 138) (2014) (stating general rule that the grant of a new trial on a ground other than insufficiency of the evidence does not preclude retrial). Compare *Jefferson v. State*, 310 Ga. 725, 727 (854 SE2d 528) (2021) (holding that the partial grant of the motion for new trial on the basis that the evidence as to two counts was constitutionally insufficient rendered the judgment on those counts final such that the defendant's direct appeal of his other convictions was authorized). In *Seals*, this Court made clear that when one or more counts of an indictment remain pending following convictions on other counts, the defendant is authorized to appeal the judgment on the convictions only by following the procedures for interlocutory review set forth in OCGA § 5-6-34 (b). See *Seals*, 311

4

Ga. at 739, 750 n.6. And when a criminal defendant is required to follow the procedures for interlocutory appeal to challenge an order, the supersedeas effect of the defendant's filing of a notice of appeal following the grant of an application for interlocutory appeal is governed by OCGA § 5-6-46. See *Sanders v. State*, 313 Ga. 191, 194 (869 SE2d 411) (2022). The relevant question in this case, then, concerns the supersedeas effect of a notice of appeal when a criminal defendant *has failed* to follow required interlocutory appeal procedures.

"Even if an appeal is jurisdictionally defective from the outset, a notice of appeal generally acts as supersedeas until the appeal is dismissed." *Jones v. Peach Trader*, 302 Ga. 504, 508 (807 SE2d 840) (2017). However, the filing of a notice of appeal in a civil case from an order that is appealable only under OCGA § 5-6-34 (b) does not act as a supersedeas in the absence of an order from the appropriate appellate court granting the interlocutory application and does not nullify actions taken by the trial court following the filing of the notice of appeal. See *Islamkhan v. Khan*, 299 Ga. 548, 551-552 (787

SE2d 731) (2016) (holding that husband's filing of a notice of appeal from judgment of divorce, which reserved issue of attorney fees, did not preclude the trial court from considering husband's motion for reconsideration and modifying the divorce judgment). See also *Jones*, 302 Ga. at 510 ("if an appellate court determines that an appeal was not authorized because the decision at issue was interlocutory rather than final, . . . then supersedeas never attached"). As we recognized in *Sanders*, OCGA § 5-6-34 (b) applies in both civil and criminal cases. See 313 Ga. at 194. And we now conclude that the rationale of *Islamkhan* applies when a criminal defendant files a notice of appeal to challenge an order that is not directly appealable.[4] 299 Ga. at 551-552 (holding that, because unauthorized notice of appeal failed to invoke this Court's appellate

[4] We note that a criminal defendant is authorized to file a notice of appeal to challenge certain interlocutory orders without having to comply with the procedures set forth in OCGA § 5-6-34 (b). See, e.g., *Roberts v. State*, 309 Ga. 639, 641-642 (847 SE2d 541) (2020) (holding that order denying timely statutory double jeopardy claim is directly appealable); *Johnson v. State*, 300 Ga. 252, 257 (794 SE2d 60) (2016) (stating that order denying a motion for acquittal on statutory speedy trial grounds is directly appealable). We also note that there may be instances in which supersedeas does not attach automatically in a criminal case, see *Jones*, 302 Ga. at 510-511 n.8, but these concepts are beyond the scope of this opinion.

jurisdiction, its filing did not deprive trial court of jurisdiction). For such a notice of appeal to be effective, it would have to have been filed after the appropriate appellate court had granted an interlocutory application. See *Tolbert v. Toole*, 296 Ga. 357, 360 (767 SE2d 24) (2014) ("[i]f the notice of appeal was effective, . . . its filing would have acted as supersedeas"). Of course, as we explained in *Jones*, only an appellate court has the authority to determine if a notice of appeal is effective, and a trial court lacks jurisdiction to dismiss a procedurally improper notice of appeal. 302 Ga. at 508-509.[5]

With these principles in mind, we now hold that Appellant's timely filing of a notice of appeal from the entry of the judgment of conviction on the felony murder and aggravated battery counts, which notice of appeal was unauthorized in the absence of an order

---

[5] We caution trial courts that if the appellate court ultimately determines that the notice of appeal is authorized and sufficient to invoke its jurisdiction, actions taken by the trial court following the filing of the notice of appeal are "subject to the peril that any decision reached which conflicts with the decision of the appellate court when rendered will thereby be made nugatory." *Avren v. Garten*, 289 Ga. 186, 190-191 (710 SE2d 130) (2011) (quoting *Southeastern Wholesale Furniture Co. v. Atlanta Metallic Casket Co.*, 84 Ga. App. 271, 276 (66 SE2d 68) (1951)).

from this Court granting an interlocutory application, see *Tolbert*, 296 Ga. at 360, did not preclude the trial court from dismissing the child cruelty counts that remained pending. Accordingly, the trial court's entry of an order of dismissal resolved the pending child cruelty counts, resulting in a final judgment that was appealable under OCGA § 5-6-34 (a).

(b) We acknowledge that in a footnote in *Seals*, 311 Ga. at 740 n.2, we implied a contrary answer to the question presented here. In *Seals*, we were considering whether the Court of Appeals erred in dismissing an appeal of a conviction where dead-docketed counts had not been finally resolved. After briefing in this Court had concluded, the trial court entered an order nolle prossing the dead-docketed counts, thus finally resolving them. Seals then filed a supplemental brief, attaching the nolle pros order. In addressing the supplemental brief, we stated that "[t]he trial court did not have jurisdiction to enter [a nolle pros order of the dead-docketed counts] because the appeal was pending here." Id. Whether the trial court had such jurisdiction was not an issue before this Court — the issue

8

was whether the Court of Appeals had correctly dismissed Seals' appeal for failing to follow the interlocutory appeal procedures, which dismissal occurred before the entry of the nolle pros order. And more significantly, the trial court's order had not been made a part of the record on appeal under OCGA § 5-6-48 (d),[6] and thus we could not consider it on appeal. See generally *Brown v. Fokes Prop. 2002*, 283 Ga. 231, 232 (657 SE2d 820) (2008) ("the exhibit attached to . . . appellate brief but not appearing in the record transmitted by the trial court cannot be considered by this court") (cleaned up). Accordingly, the statement in *Seals* regarding a trial court's authority to nolle pros pending counts following the filing of a notice of appeal does not control here.[7] As we have previously explained:

> It is, of course, axiomatic that a decision's holding is limited to the factual context of the case being decided and

---

[6] OCGA § 5-6-48 (d) provides that "[a]t any stage of the proceedings" an appellate court "shall by order . . . take any other action to perfect the appeal and record so that the appellate court can and will pass upon the appeal and not dismiss it." Because the trial court's dismissal order was in the record when the record was docketed in this Court, we need not address the scope of the General Assembly's directive that the appellate court take action to perfect an appeal.

[7] We hereby disapprove the statement in *Seals* that "[t]he trial court did not have jurisdiction to enter that order because the appeal was pending here." See 311 Ga. at 740 n.2.

the issues that context necessarily raises. Language that sounds like a holding — but actually exceeds the scope of the case's factual context — is not a holding no matter how much it sounds like one.

*Schoicket v. State*, 312 Ga. 825, 832 (865 SE2d 170) (2021) (quoting

*Ga. Interlocal Risk Mgmt. Agency v. City of Sandy Springs*, 337 Ga.

App. 340, 340 n.1 (788 SE2d 74) (2016)).

(c) Because the trial court's prompt dismissal of two pending child cruelty counts rendered the judgment final, Appellant's previously filed premature notice of appeal ripened. See *Gillen v. Bostick*, 234 Ga. 308, 310-311 (215 SE2d 676) (1975) (holding that a notice of appeal filed before the entry of the judgment is effective to vest jurisdiction in the appellate court). See also *Southall v. State*, 300 Ga. 462, 466-467 (796 SE2d 261) (2017) (stating that once a judgment is entered, an early notice of appeal "ripens and becomes as timely as any notice could ever be" and that "[i]t would . . . go beyond the statutory mandate to deem such premature . . . notices of appeal 'void' — so long as they sufficiently indicate the judgment from which relief is sought — when they are filed at any time prior

10

to the expiration of the 30-day time limit[ ]" in OCGA § 5-6-38 (a) (cleaned up)).[8] Accordingly, the appeal is properly before the Court.

2. Viewed in the light most favorable to the verdicts, the evidence at trial showed that sometime after 9:00 p.m. on February 27, 2011, Appellant brought Samuel to the emergency room at Liberty Regional Hospital in Liberty County. Samuel was unresponsive, and Appellant told Dr. James Green, the treating emergency room physician, that Samuel had suffered an injury on the playground four to five hours earlier that day; that thereafter Samuel ate a hotdog, watched television, and played video games; and that ten minutes before Appellant arrived in the emergency room, Samuel "went listless." At the hospital, Samuel was completely unresponsive, was diagnosed with a severe brain injury, and was airlifted to Memorial Hospital in Savannah, where he

---

[8] Although we characterized a defective *"attempted appeal"* in *Islamkhan*, 299 Ga. at 551, as "a nullity" that was incapable of invoking this Court's jurisdiction, this description was more about the effect of the notice of appeal at the time it was filed. And nothing in *Islamkhan* is contrary to the well-settled principle that a notice of appeal that is filed to challenge an anticipated final judgment ripens upon the entry of the final judgment.

11

remained in a coma. When a test showed that no blood was flowing to his brain, Samuel was declared dead on March 3, 2011.

At trial, Appellant told a different story than he had provided to the doctors who treated Samuel. According to his trial testimony, Appellant had been at his home babysitting Samuel on February 27 while Jocelyn was at work. When it was time to leave to pick up Jocelyn after her shift ended about 9:30 p.m., Samuel was sound asleep. Appellant put on Samuel's jacket, socks, and shoes, but Samuel did not awaken. As Appellant carried Samuel to the car, Appellant was trying to wake him up and tossed him into the air. At that moment, Appellant suddenly had a sharp pain in his groin — related to recent surgery he had in December 2010 — and collapsed on the ground and was unable to catch Samuel, who fell on a concrete walkway. According to Appellant, Samuel was "gurgling" and non-responsive. Appellant called Jocelyn, told her "what had happened,"[9] and then drove Samuel to the hospital. Appellant did not tell the doctors or anyone else what actually happened because

---

[9] Jocelyn did not testify at trial.

he was scared.

Medical examiner Dr. James Downs, who performed Samuel's autopsy, concluded that the cause of death was multiple acute blunt force injuries to his head. In his testimony, Dr. Downs described Samuel's numerous external and internal head injuries, which included an abnormal amount of blood around, and swelling of, his brain. Dr. Downs opined that these injuries could not have been received simultaneously from a fall but rather indicated multiple impacts and applications of blunt force. Additionally, Dr. Downs testified that Samuel suffered numerous injuries to his abdomen, chest, back, arms, and legs, and he opined that most of these injuries also happened only a few hours before Samuel arrived at the emergency room and were not indicative of having been sustained in a fall. Dr. Downs further testified that internal injuries around Samuel's eyes were indicative of an "inflicted" rather than an accidental injury and that the injury to Samuel's spine also indicated a violent impact.

The physicians who treated Samuel at the hospitals, and who

13

testified as experts, testified that Samuel's injuries were not consistent with Appellant's explanations of how the injuries occurred. Dr. Green, who evaluated Samuel at the emergency room, testified that the amount of blood on Samuel's brain indicated either a "slow bleed" that had continued for a very long time or an immediate trauma that had happened only a few minutes before the victim's arrival at the emergency room. Dr. Green explained that if Samuel suffered a slow bleed over a long period of time, he would not have been able to eat a hotdog, play video games, and watch television after the injury; instead, he would have been vomiting and complaining of a headache. Dr. Mary Carol Lytle, who treated Samuel at Memorial Hospital, testified that Samuel's injury was similar to injuries she had seen where a child was ejected from a vehicle during a high-speed automobile accident or had been riding an all-terrain vehicle without a helmet and was thrown from the vehicle following a high-speed crash. According to Dr. Lytle, Samuel's injuries were not consistent with a fall from standing height or falling to the ground after being tossed in the air. She

testified that a child would have to fall from a height of at least 15 to 20 feet in order to sustain the type of injuries Samuel suffered.

The State also presented testimony from two of Samuel's babysitters, Sandra McPhearson and Shannon Wright. McPhearson testified that in early January 2011 she started babysitting Samuel in her home four days a week while Jocelyn was at work; that on the first day she cared for him, he had two bruises on his cheeks; that on another occasion, she observed bruises and a "skinned place" on his arm; and that when she asked Samuel about the injury on his arm, he responded "Robert boo boo." McPhearson also described Samuel's unusual and extremely negative reaction the one day when Appellant accompanied Jocelyn to pick him up. On that occasion, according to McPhearson, Samuel saw Appellant's car and "immediately started screaming"; was "crying and kicking and screaming" as Jocelyn carried him to Appellant's car; and put his feet up to try to prevent being placed in Appellant's car. McPhearson further testified that on February 23, Samuel was not feeling well, was tired, was not eating much, and had "little blood dots" around

15

his eyes and down the side of his face and that she asked Jocelyn to pick up Samuel and take him to the doctor. The following day, it appeared to McPhearson that Samuel still did not feel well.

Wright testified that Samuel stayed overnight at her home the night before his hospitalization. Although he seemed tired, he ate dinner, watched television, and slept normally, but when Appellant came the next morning to pick him up, he did not want to leave Wright's home and cried and clung to Wright's leg.

Dr. Francisco Herran, a pediatrician, testified that on February 25, 2011, Jocelyn brought Samuel into his office for an evaluation of a rash on Samuel's face. Dr. Herran testified that the rash, or "petechia," can be caused by forceful vomiting but also may be present in situations where a child has suffered physical abuse. However, Dr. Herran testified that during the evaluation, he did not have any concerns about child abuse.

Finally, the State introduced into evidence an eight-minute video that showed interactions Appellant had with Samuel on two occasions prior to February 27, 2011. The first excerpt showed

Samuel cry as Appellant repeatedly offered him containers of toys and then took the containers away as Samuel tried to take a toy. The second excerpt showed Appellant toss Samuel onto what appears to be a couch or chair, while asking if Samuel wants "to be thrown." In the second excerpt, Appellant also appeared to lightly punch and slap Samuel, while asking if it hurts and if Samuel wants to "fight." Samuel cried during the "fighting" and in response to Appellant's question as to whether it hurts, sometimes said "it hurts" and sometimes said "no hurt." Samuel appeared to laugh and say "it fun" while being tossed.

3. Appellant contends that the evidence presented at trial was constitutionally insufficient to support his convictions for felony murder and aggravated battery under *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). He also asserts that the evidence supported convictions only on the lesser included offenses on which the jury was instructed — reckless conduct and involuntary manslaughter premised on reckless conduct. We disagree.

17

To convict Appellant of felony murder while in the commission of first degree cruelty to children,[10] as alleged in the indictment, the State was required to prove that Appellant caused Samuel's death "by inflicting a severe blunt force trauma to the head of Samuel" and did so in such a way as to "maliciously cause Samuel Carroll, a child under the age of eighteen (18) years, cruel and excessive physical and mental pain by inflicting severe blunt force trauma" to his head. To convict Appellant of aggravated battery, as alleged in the indictment, the State was required to prove that Appellant "did maliciously cause bodily harm" to Samuel "by rendering his brain . . . useless."[11] When viewed in the light most favorable to the verdicts, see *Jackson*, 443 U. S. at 319, the evidence presented at trial and summarized above authorized the jury to reject Appellant's testimony; credit the testimony of the physicians over Appellant's

---

[10] OCGA § 16-5-70 (b) provides that "[a]ny person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain."

[11] OCGA § 16-5-24 (a) provides that "[a] person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof."

inconsistent explanations for Samuel's injuries; and conclude that Appellant, who evidence indicated was the sole person taking care of Samuel at the time he suffered his injuries, inflicted severe blunt force trauma to Samuel's head that rendered his brain "useless" and caused his death and that Appellant did so maliciously rather than with the lesser culpability required to establish reckless conduct.[12] Furthermore, the jury was authorized to conclude that because of the force required to inflict the injuries to Samuel's head and brain, Samuel suffered cruel and excessive physical pain. Accordingly, we conclude that the evidence was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of aggravated battery and felony murder based on cruelty to children in the first degree. See id. See also *Hounkpatin v. State*, 313 Ga. 789, 793 (873 SE2d

---

[12] Under OCGA § 16-5-60 (b), "reckless conduct" is committed when a person "causes bodily harm to . . . another person by consciously disregarding a substantial and unjustifiable risk that his or her act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

201) (2022) (stating that jury was authorized to credit experts' testimony as to cause of child's death and to reject defense hypothesis as to another cause); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (cleaned up)).

4. Although the evidence was legally sufficient to support Appellant's convictions, we have identified a merger error that harms Appellant and therefore should be corrected. See *Dixon v. State*, 302 Ga. 691, 696-697 (808 SE2d 696) (2017) (noting this Court's discretion to correct merger errors sua sponte and stating that "[t]here are powerful reasons to exercise that discretion when a merger error leads to an unauthorized conviction and sentence"). The indictment charged that the same conduct established aggravated battery and felony murder predicated on cruelty to children. Pretermitting whether the two offenses, as charged, required proof of a fact that the other did not, see *Drinkard v. Walker*, 281 Ga. 211, 214-215 (636 SE2d 530) (2006), we conclude

that merger is required under OCGA §§ 16-1-7 (a) (1) and 16-1-6 (2). OCGA § 16-1-7 (a) (1) provides that when the same conduct of a defendant establishes the commission of more than one crime, he may not be convicted of more than one crime if "[o]ne crime is included in the other," and OCGA § 16-1-6 (2) provides that one crime is included in another when the crime differs from the other crime only in that it involves "a less serious injury or risk of injury to the same person . . . or a lesser kind of culpability." And it is well settled that "the only difference between aggravated battery and murder is that the former requires a less serious injury to the person of the victim, as the injury to a bodily member specified in the aggravated battery statute is obviously less serious than death." (cleaned up). *Soilberry v. State*, 289 Ga. 770, 772-773 (716 SE2d 162) (2011) (holding that where indictment alleged same conduct, trial court erred in failing to merge conviction for aggravated battery into murder conviction). Accordingly, we vacate Appellant's separate sentence for aggravated battery.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

Decided February 21, 2023.

Murder. Liberty Superior Court. Before Judge Cheney.

*Rouse & Copeland, Amy L. Copeland*, for appellant.

*Tom Durden, District Attorney, Melissa L. Poole, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Emily R. Polk, Assistant Attorney General*, for appellee.

*Jason B. Sheffield, Brandon A. Bullard, Jill A. Travis, Mazie L. Guertin, Gregory A. Willis; Omotayo B. Alli, Natalie K. Glaser; Peter J. Skandalakis, Robert W. Smith, Jr.*, amici curiae.