318 Ga. 550
FINAL COPY

S23G0341. CITY OF WINDER v. BARROW COUNTY.

MCMILLIAN, Justice.

This case addresses three issues of first impression involving the interpretation and application of the Services Delivery Strategy ("SDS") Act (the "Act"), OCGA § 36-70-20 et seq.,[1] in connection with disputes between the City of Winder (the "City") and Barrow County (the "County") about the delivery of services to County and City residents and property owners and how those services are to be funded.[2] As we explain below, we conclude that whether the

[1] OCGA § 36-70-20 explains that the Act is intended "to provide a flexible framework within which local governments in each county can develop a service delivery system that is both efficient and responsive to citizens in their county"; "to minimize inefficiencies resulting from duplication of services and competition between local governments[;] and to provide a mechanism to resolve disputes over local government service delivery, funding equity, and land use."

[2] The Court thanks the Georgia Municipal Association, Inc.; the Cities of Stockbridge and Valdosta; the Association County Commissioners of Georgia; and Bulloch, Cherokee, Dawson, Forsyth, Greene, Gwinnett, Henry, Lowndes, Lumpkin, Newton, Rabun, Screven, and Walker Counties for their amici curiae briefs, which greatly assisted us in our consideration of these important questions of Georgia law. This case was orally argued before this Court on October 17, 2023.

maintenance of county roads primarily benefits the unincorporated area of a county requires consideration of the totality of the circumstances involved and cannot be resolved as a matter of law; that services that primarily benefit the unincorporated area of the county must be funded through the mechanisms delineated in the Act; and that the proceeding set out in the Act for resolution of SDS disputes does not permit the County to challenge whether water rates charged by the City are an illegal tax and whether the City may transfer profits from providing water service into its general fund.

In 1999, Barrow County and the municipalities located within the County—the cities of Winder, Auburn, and Statham and the towns of Bethlehem, Braselton, and Carl—entered into a comprehensive SDS Agreement for the provision of a number of services to County and municipal residents and property owners including road maintenance and water utility service. That Agreement was extended several times and was set to expire on February 28, 2019. In advance of that deadline and in an effort to

avoid sanctions under the Act,[3] the parties attempted to come to a consensus on a new SDS Agreement, but the negotiations between the parties did not successfully resolve all of their issues. As a result, in 2018 and 2019, the County, the City, and other municipalities within the County participated in voluntary mediation under the Act. See OCGA § 36-70-25.1 (c).[4] The parties were able to settle all but two of forty-one service issues in dispute through mediation.

To resolve the remaining conflicts, the County filed a three-count petition pursuant to OCGA § 36-70-25.1 (d)[5] seeking court-

---

[3] Because the parties failed to agree to an updated SDS Agreement by the February 28, 2019 deadline, sanctions under OCGA § 36-70-27 (a) were imposed on the County and each municipality. However, after the County filed a petition seeking resolution of these issues, the superior court ordered that the sanctions be held in abeyance during the pendency of the litigation. See OCGA § 36-70-25.1 (d) (2) ("It shall be in the discretion of the judge to hold the sanctions specified in Code Section 36-70-27 against one or more of the parties in abeyance pending the disposition of the action.").

[4] OCGA § 36-70-25.1 (c) provides for the use of alternative dispute resolution, as follows:

If a county and the affected municipalities in the county are unable to reach an agreement on the strategy prior to the imposition of the sanctions provided in Code Section 36-70-27, a means for facilitating an agreement through some form of alternative dispute resolution shall be employed.

[5] OCGA § 36-70-25.1 (d) (1) (A) allows the parties to seek resolution of their disputes in superior court:

In the event that the county and the affected municipalities

3

ordered mediation and/or a judicial resolution of the disputes. The petition identified the remaining service issues as relating to (1) the funding for the County's road maintenance and (2) the water utility service, including "(a) the arbitrariness of the water rate differentials charged by [the City] to customers located inside and outside of [the] city limits and (b) [the] County's authority to provide water service to all customers located in the unincorporated area of the County."

The County later amended its petition to add another count ("Count IV") alleging that the City's water service charges for residents in unincorporated areas of the County or in another municipality (the "Outside Customers") amounted to an illegal tax on such residents based on the differential in the rates the City

---

in the county fail to reach an agreement after the imposition of sanctions provided in Code Section 36-70-27, then the following process is available to the parties: . . . [t]he county or any affected municipality located within the county may file a petition in [the] superior court of the county seeking mandatory mediation.

If the court-ordered mediation does not resolve the disputes, "any aggrieved party may petition the superior court and seek resolution of the items remaining in dispute. The . . . judge shall conduct an evidentiary hearing or hearings as such judge deems necessary and render a decision with regard to the disputed items." OCGA § 36-70-25.1 (d) (2).

charged its own residents and those it charged the Outside Customers. Under the previous SDS Agreement between the County and the City, the City provided exclusive water service to an area that included the City but also the Outside Customers. The County alleged that, between 2012 and 2017, the City overcharged the Outside Customers to generate a total of over $13 million in profit above the actual cost of providing the service through what it characterized as arbitrary, excessive, and abusive water rates and that the City transferred these profits to its general fund. The County also alleged that throughout the SDS mediation process, the County demanded that the City discontinue monetary transfers out of its water fund into the general fund. Count IV

> requests that the Court enter an order finding that the establishment of Outside Customer water rates and fees at a level designed to generate a profit from Outside Customers constitutes an illegal tax on Outside Customers and that the City [ ] does not have the legal authority to transfer profits collected from the sale of water to Outside Customers out of its Water Fund and into its General Fund except to recover the cost of bona fide support provided to the Water Fund by other governmental funds.

5

After the parties participated in court-ordered mediation, which again failed to resolve the outstanding service delivery issues, they began to engage in discovery. Prior to the completion of that process, the County and the City filed cross-motions for partial summary judgment on the legal issue of what standard should be used under OCGA § 36-70-24 (3) (A)[6] to determine whether residents, individuals, and property owners of the incorporated areas of the County could be charged for the costs of road maintenance for county roads located in unincorporated areas of the County. The City argued that under OCGA § 36-70-24 (3) (A), the geographic location of the roads, which necessarily is where the money would be spent to perform maintenance on the roads determined which County residents, individuals, and property owners could be charged for the maintenance,[7] while the County

_____

[6] OCGA § 36-70-24 (3) (A) provides in relevant part: "The strategy shall ensure that the cost of any service which a county provides primarily for the benefit of the unincorporated area of the county shall be borne by the unincorporated area residents, individuals, and property owners who receive the service."

[7] The City contemporaneously moved to dismiss Count II of the petition,

6

argued that road maintenance funding depended, instead, on who had access to and used the roads. Thus, the County contended that municipal residents could also be charged for maintenance of county roads. The City later filed a second motion for partial summary judgment, contending that the County's source of revenue to fund services for the unincorporated areas was limited to the mechanisms spelled out in OCGA § 36-70-24 (3) (B): "property taxes, insurance premium taxes, assessments, or user fees."[8] In addition, the City filed a motion to dismiss Count IV, arguing that the issues of whether the City's water rate charges to Outside Customers amounted to an illegal tax and whether the City could transfer any profits gleaned from the excess charges to its general fund were beyond the scope of the statutory proceeding prescribed in OCGA §

---

asserting that the County failed to fulfill the statutory requirements for bringing such a claim, which the City contended should have been brought in a separate proceeding. The superior court denied that motion, but the City does not appeal that ruling.

[8] Under OCGA § 36-70-24 (3) (B),

[s]uch funding shall be derived from special service districts created by the county in which property taxes, insurance premium taxes, assessments, or user fees are levied or imposed or through such other mechanism agreed upon by the affected parties which complies with the intent of subparagraph (A) of this paragraph[.]

36-70-25.1 (d).

Following a hearing, the superior court granted the County's cross-motion for partial summary judgment on the road maintenance funding issue and denied the City's motion, concluding as a matter of law that road maintenance funding "is focused solely on those 'that receive the service.'" The court also denied the City's second motion for partial summary judgment that sought to limit the sources of revenue for funding services primarily for the benefit of the unincorporated areas to property taxes, insurance premium taxes, assessments, or user fees under OCGA § 36-70-24 (3) (B). In addition, the court denied the City's motion to dismiss Count IV of the petition.

The City appealed the superior court's orders to the Court of Appeals, which affirmed the superior court's rulings in a split decision. See *City of Winder v. Barrow County*, 365 Ga. App. 832 (880 SE2d 323) (2022).

We granted the City's petition for certiorari to consider the Court of Appeals's rulings on three questions:

8

(1) Is the maintenance of county roads in an unincorporated area of the County, which connect to roads within the City, "primarily for the benefit of the unincorporated area" as that phrase is used in OCGA § 36-70-24 (3) (A)?

(2) Does OCGA § 36-70-24 (3) (B) require that funding for services provided primarily for the benefit of unincorporated areas come from "property taxes, insurance premium taxes, assessments, or user fees" levied or imposed with a special service district, or does it authorize the County to use other sources of revenue?

(3) Is a superior court that is adjudicating a petition under OCGA § 36-70-25.1 (d) (2) authorized to determine whether the City's usage rates charged to water customers in unincorporated areas of the County are an illegal tax?

1. Addressing each of these issues in turn, we begin with the parties' dispute over who should bear the cost of county road maintenance in the unincorporated area of the County. Our review of the Court of Appeals's rulings on the parties' cross-motions for partial summary judgment is de novo because this appeal involves

9

only legal issues, not questions of fact.[9] See *Raffensperger v. Jackson*, 316 Ga. 383, 387 (2) (888 SE2d 483) (2023).

The parties agree that the resolution of this issue is governed by OCGA § 36-70-24 (3) (A), which provides:

> The [service delivery] strategy shall ensure that the cost of any service which a county provides primarily for the benefit of the unincorporated area of the county shall be borne by the unincorporated area residents, individuals, and property owners who receive the service.

However, the parties disagree on the standard for determining whether maintenance of county roads is "primarily for the benefit of the unincorporated area." The County argues that if the county roads are available to anyone in the county to use, then the road maintenance is not primarily for the benefit of the unincorporated area; in contrast, the City argues that as a matter of law, if the county roads are located primarily in the unincorporated area, then maintenance of those roads is primarily for the benefit of the

---

[9] The parties did not submit evidence in the trial court in support of their summary judgment motions on the issues of where the county roads are located or who was actually using the roads and focused their arguments on the legal issue of the standard to be used under OCGA § 36-70-24 (3) (A).

unincorporated area.

On cross-motions for partial summary judgment, the superior court agreed with the County and determined that the inquiry for determining who should bear the costs of road maintenance in this case, "[should be] focused solely on those 'that receive the service,'" citing the text at the end of the first sentence of OCGA § 36-70-24 (3) (A), reasoning that the statute makes "no mention of where the services are located." In affirming the superior court's ruling, the Court of Appeals viewed the text of OCGA § 36-70-24 (3) (A) differently, determining that the concepts of road usage and "benefit," as used in the statute, are "inextricably intertwined," and "the focus of the Act is not on the geographical location of the public service, but on who uses (and thus *benefits*) from the service."[10] *Winder*, 365 Ga. App. at 835-36 (1). The Court of Appeals further determined as a matter of law that county roads, "regardless of their specific geographic location, benefit *all* residents of the county — as

---

[10] The court noted that it was affirming the superior court under the "right for any reason" doctrine. *Winder*, 365 Ga. App. at 836 (1) n.6.

11

does their upkeep." Id. at 836 (1) (citing generally *DeKalb County v. City of Decatur*, 247 Ga. 695, 697 (2) (279 SE2d 427) (1981) ("County taxpayers residing in municipalities enjoy the use of DeKalb County parks, roads and other facilities, and the protection of the DeKalb County police, while they are going about their business or enjoying their leisure time outside the boundaries of the municipalities in which they reside.")).

We begin our analysis by setting out first principles. "When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant." *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted). And "[a]s in all cases of statutory construction, we remain mindful that we must give the text its plain and ordinary meaning, view it in the context in which it appears, and read it in its most natural and reasonable way." *State v. Cook*, 317 Ga. 659, 660 (1) (893 SE2d 670) (2023) (citation and punctuation omitted). We determine the ordinary public meaning of legal text by considering the meaning the text had at the time it was enacted. See

12

*Seals v. State*, 311 Ga. 739, 740 (1) (860 SE2d 419) (2021), disapproved of on other grounds by *Gonzales v. State*, 315 Ga. 661 (884 SE2d 339) (2023). Dictionaries are often helpful "[i]n ascertaining the ordinary meaning of a word that is not defined in a statute," but they "cannot be the definitive source of ordinary meaning in questions of textual interpretation because they are acontextual, and context is a critical determinant of meaning." *McBrayer v. Scarbrough*, 317 Ga. 387, 394 (2) (d) (893 SE2d 660) (2023) (citation and punctuation omitted).

Turning to the text, OCGA § 36-70-24 (3) (A) explains that the "cost of any service"—in this case, road maintenance—"which a county provides primarily for the benefit of the unincorporated area of the county" shall be borne by persons in the unincorporated area "who receive the service." Thus, the question is whether maintenance of the County roads is a service that the County "provides primarily for the benefit of the unincorporated area." The key terms in that phrase are "primarily" and "benefit," so we begin by construing those terms according to their meaning at the time of

13

their enactment.

At the time the Act went into effect in 1997, the term "primarily" was defined for ordinary usage in this context as "for the most part[,] chiefly." Merriam-Webster's Collegiate Dictionary 925 (10th ed. 1995). Black's Law Dictionary defined "primary," the adjectival form of the adverb "primarily," as "[f]irst; principal; chief; leading." Black's Law Dictionary (Abridged) 826 (6th ed. 1991). See *Zaldivar v. Prickett*, 297 Ga. 589, 596 (1) (774 SE2d 688) (2015) (looking to Black's Law Dictionary for "the usual and customary meaning of [a] term as used in a legal context"). Moreover, in construing an ordinance that was enacted nine years after the Act, this Court determined that the word "primarily" is not ambiguous and means "for the most part," citing Merriam-Webster's dictionary and also referencing the definition of the word "primarily" as "mainly; principally" in Webster's New World College Dictionary (2007). *Rockdale County v. U. S. Enterprises, Inc.*, 312 Ga. 752, 767 (3) (b) (865 SE2d 135) (2021) (citing *United States v. Gibson*, 998 F3d 415, 419-420 (III) (A) (9th Cir. 2021) ("The phrase 'primarily used by

14

children' is not indeterminate.")); *In re Kelly*, 841 F2d 908, 916 (III) (A) (3) (9th Cir. 1988) ("[T]he modifier 'primarily' is not a word that is ambiguous or difficult to understand."); *Pizza di Joey, LLC v. Mayor and City Council of Baltimore*, 235 A3d 873, 907 (III) (C) (2) (b) (Md. 2020) (holding that "primarily engaged in" has a "generally accepted meaning[ ]")).[11] "Benefit" was defined in 1997 as "something that promotes well-being" or "useful aid." Merriam-Webster at 106, and "[a]dvantage; profit; fruit; privilege; gain; interest . . . [;] [b]enefits are something to advantage of, or profit to, [the] recipient." Black's Law Dictionary at 108.

Applying these definitions and considering the context and syntax of the sentence in which these words appear in the statute, we view the phrase "any service which a county provides primarily for the benefit of the unincorporated area of the county" to mean any service a county provides for the chief advantage, privilege, or

_____

[11] We note that the county ordinance at issue in *Rockdale County* expressly provided that all words not otherwise defined in the ordinance "are intended to have the commonly accepted definitions contained in a recent edition of the Merriam-Webster Dictionary." *Rockdale County*, 312 Ga. at 755 (1). No such direction appears in the Act.

interest of, or chiefly and principally for the unincorporated area. And it is only if it is determined that *the unincorporated area* is the primary beneficiary of the service that the "unincorporated area residents, individuals, and property owners who receive the service" bear the costs of that service.

We see nothing in the text of OCGA § 36-70-24 (3) (A) that supports the County's argument that the correct standard for determining the primary beneficiary of a service turns solely on who uses the service. As we understand it, the County argues that the phrase "who receive the service" at the end of the first sentence of OCGA § 36-70-24 (3) (A) means that those who have access to and may use the service—in this case, maintenance of county roads— are, as a matter of law, those who primarily benefit from it under the meaning of the statute. But this construction ignores the syntax and structure of OCGA § 36-70-24 (3) (A) and improperly links two grammatically unrelated phrases in the text—the phrase "primarily for the benefit of" and the phrase "who receive the service" at the end of the sentence—while ignoring the phrase "the unincorporated

16

area of the county" that comes between them. Courts often rely on the rules of grammar to provide a structure for discerning the ordinary meaning of legal text, and we see no reason to depart from those rules here. See *State v. SASS Group, LLC*, 315 Ga. 893, 900-01 (2) (b) (885 SE2d 761) (2023) ("We may also refer to the rules of English grammar, inasmuch as those rules are the guideposts by which ordinary speakers of the English language commonly structure their words[.]" (citation and punctuation omitted)).

Nevertheless, the County argues that any construction of OCGA § 36-70-24 (3) (A) not based strictly on who uses the county roads would violate the Uniformity Clause of the Georgia Constitution, Ga. Const. of 1983, Art. VII, Sec. I, Par. III (a) ("[A]ll taxation shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax."). However, to the extent that the County is challenging the constitutionality of OCGA § 36-70-24 (3) (A), we need not address that argument in this appeal because, even though the County raised the issue before the superior court, the court did not issue a ruling on it. See *Franzen v.*

17

*Downtown Dev. Auth. of Atlanta*, 309 Ga. 411, 425 (3) (d) n.27 (845 SE2d 539) (2020) ("This Court does not reach the constitutionality of a statute unless it clearly appears in the record that the constitutional issue was directly and properly raised in the trial court and distinctly ruled on by the trial judge." (emphasis omitted)). Moreover, to the extent that the County is asserting that under the canon of constitutional doubt we should construe OCGA § 36-70-24 (3) (A) to avoid a potential conflict with the Uniformity Clause, that canon does not apply to a statute that we have determined to be unambiguous. See *Domingue v. Ford Motor Co.*, 314 Ga. 59, 68 (2) (c) (875 SE2d 720) (2022) (courts cannot rely on the canon of constitutional doubt where the legal text "is clear and is not susceptible of more than one meaning"); *Crowder v. State of Ga.*, 309 Ga. 66, 73 (2) (d) n.8 (844 SE2d 806) (2020) (explaining that the canon of constitutional doubt cannot be relied upon to avoid a "potential constitutional issue" when "we can identify only one plausible interpretation of [a] statute").

The County also argues against our plain reading of the text of

18

OCGA § 36-70-24 (3) (A), which requires an analysis of whether the service primarily benefits the unincorporated area of the county–not simply a consideration of who uses the service–because it contradicts the interpretation of the Act set out in the publication Charting a Course for Cooperation and Collaboration – An Introduction to the Service Delivery Strategy Act for Local Governments. This document was published in 1997, after the date of the Act's enactment, by the Georgia Department of Community Affairs, the department charged with implementing the Act, and several organizations involved in drafting the Act—the Association County Commissioners of Georgia, the Georgia Municipal Association, and the Carl Vinson Institute of Government at the University of Georgia. The publication describes itself as a "guidebook" for city and county officials for implementation of the Act and does not purport to be binding legal authority. With respect to county road maintenance, this guidebook stated that, under the Act, county road maintenance is not provided primarily for the benefit of the unincorporated area within the meaning of OCGA §

19

36-70-24 (3) (A) because county roads are "available" to all county residents, thus purporting to dictate that the only factor to be considered on the question of whether county road maintenance primarily benefits the unincorporated area is who uses the roads, despite the express language in the statute.

However, even in the unlikely event that this guidebook could constitute an agency's interpretation of a statute on par with duly adopted regulations,[12] we defer "to an agency's interpretation [of legal text] only when we are unable to determine the meaning of the legal text at issue." *City of Guyton v. Barrow*, 305 Ga. 799, 802 (2) (828 SE2d 366) (2019). In other words, we only defer to an agency's interpretation, if at all, when the text is ambiguous. Because we discern no ambiguity in the text of OCGA § 36-70-24 (3) (A), we need not consider the interpretation set forth in the guidebook. See id. at

---

[12] Compare *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 159-60 (2) (664 SE2d 223) (2008) (Court of Appeals erred in giving interpretation in agency manual deference due a statute, rule or regulation where manual "had not undergone the scrutiny afforded a statute during the legislative process or the adoption process through which all rules and regulations must pass").

803 (2) ("A statute or regulation is not ambiguous merely because interpreting it is hard.").

Accordingly, the Court of Appeals erred in affirming the superior court's grant of partial summary judgment to the County and denial of partial summary judgment to the City on this issue, so we reverse and remand for further proceedings consistent with this opinion. To that end, we note that despite the arguments of the parties, the determination of whether county roads and their maintenance are provided primarily for the benefit of the unincorporated area of the County does not depend just on one factor such as geography or usage, and we decline to determine as a matter of law whether county roads located mostly in the unincorporated area of the County are primarily for the benefit of the unincorporated area. Instead, whether road maintenance is primarily for the benefit of the unincorporated area of the County is a determination the superior court is authorized to make on remand after an evidentiary hearing and after considering the totality of the circumstances, including geographic location and usage of the

21

roads.[13] See OCGA § 36-70-25.1 (d) (2) ("The visiting or senior judge shall conduct an evidentiary hearing or hearings as such judge deems necessary and render a decision with regard to the disputed items.").[14]

2. We next address whether OCGA § 36-70-24 (3) (B) requires that funding for services provided primarily for the benefit of the unincorporated area come from "property taxes, insurance premium taxes, assessments, or user fees" levied or imposed within a special service district, or, in contrast, it authorizes the County to use other sources of revenue from within that special service district.

OCGA § 36-70-24 (3) (B) states that the funding for services provided primarily for the benefit of an unincorporated area

> shall be derived from special service districts created by the county in which property taxes, insurance premium taxes, assessments, or user fees are levied or imposed or

---

[13] We emphasize that geographic location and usage of roads are only two factors that the superior court may consider depending on the evidence presented by the parties, which could also include traffic studies and other expert analysis, and we decline to delineate or limit other factors that the superior court may consider to make this determination.

[14] The Act provides that proceedings seeking resolution of SDS disputes "shall be assigned to a judge . . . who is not a judge in the circuit in which the county is located. The judge selected may also be a senior judge . . . who resides in another circuit." OCGA § 36-70-25.1 (d) (1) (A).

through such other mechanism agreed upon by the affected parties which complies with the intent of subparagraph (A) of this paragraph[.]

The County argues that "property taxes" and "assessments" refer to general categories of funding and therefore the County is allowed to use any funding source within the special service district to pay for services intended primarily for the benefit of the unincorporated area.[15] The City argues, on the other hand, that the statutory list is intended to be exhaustive, that the term "assessments" means "special assessments" because "assessments" must be read consistently with the other revenue sources listed, which are specific and not general terms, and that "property taxes" refer only to ad valorem property taxes. [16]

First, neither the term "property taxes" nor the term "assessments" is defined in the Act, so we must construe these terms

_____

[15] Specifically, the County argues that "property taxes" and "assessments" include cable franchise taxes, alcohol excise taxes, financial institution taxes, hotel/motel taxes, occupation taxes, and railroad equipment taxes.

[16] The City and the County do not appear to dispute the meaning of the terms "insurance premium taxes" and "user fees," so our analysis will focus on the meaning of "property taxes" and "assessments."

using the rules of statutory construction, some of which we have already discussed in Division 1. The County somewhat simplistically argues that because "property" can refer to intangible, personal, or real property, "property taxes" as used in the statute means any kind of tax on any kind of property. However, the County cites no authority for that proposition.

In determining the original public meaning of the term "property taxes," we first note that at the time of the statute's enactment, Merriam-Webster defined "property tax" as "a tax levied on real or personal property," Merriam-Webster at 935, and Black's defined "property tax" in the legal context as "[a]n ad valorem tax, usually levied by a city or county government, on the value of real or personal property that the taxpayer owns on a specified date." Black's Law Dictionary at 847. As we have made clear, dictionaries are only a starting point for determining the original meaning of text, particularly where, as here, the definitions are in tension. See *McBrayer*, 317 Ga. at 394 (2) (d).

In determining the meaning of a term, "we may [also] look to

24

other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question." *Langley v. State*, 313 Ga. 141, 143 (2) (868 SE2d 759) (2022) (citation and punctuation omitted). In addition to "property taxes," OCGA § 36-70-24 (3) (B) lists "insurance premium taxes" as a potential source for revenue, which cuts against the County's argument that the term "property taxes" refers to taxes of any kind because such an interpretation would improperly make the term "insurance premium taxes" superfluous. See *Camden County v. Sweatt*, 315 Ga. 498, 509 (2) (b) (883 SE2d 827) (2023) (noting fundamental rule of statutory construction that courts should "avoid a construction that makes some language mere surplusage" (citation and punctuation omitted)).

Also, OCGA § 36-70-24 (3) (B) refers to "special service districts" and makes clear that the listed mechanisms for funding are to be levied or imposed within a special service district. Thus, in the legal background of OCGA § 36-70-24 (3) (B) is the Special

25

Districts Paragraph of the Georgia Constitution, which enables the creation of special service districts "for the provision of local government services within such districts," and provides that "fees, assessments, and taxes may be levied and collected within such districts to pay, wholly or partially, the cost of providing such services therein and to construct and maintain facilities therefor." Ga. Const. of 1983, Art. IX, Sec. II, Par. VI. That the Special Districts Paragraph lists the categories of funding sources for county services as "fees, assessments, and taxes" further supports that when the General Assembly used the term "property taxes" instead of "taxes" in OCGA § 36-70-24 (3) (B), it intended to specify a subcategory of taxes—ad valorem taxes levied on real or personal property—to the exclusion of other taxes, including the non-ad valorem taxes on property that the County claims it can use as funding sources. See *Pandora Franchising, LLC v. Kingdom Retail Group, LLLP*, 299 Ga. 723, 728 (1) (b) (791 SE2d 786) (2016) ("Where the legislature uses certain language in one part of the statute and different language in another, the Court assumes different meanings were intended."

26

(citation and punctuation omitted)).

The County also argues that the term "assessments" in OCGA § 36-70-24 (3) (B) refers to any kind of revenue measure. On the other hand, the City asserts that "assessments" refer only to "special assessments." The statute provides no qualifier for the term "assessments," and, at the time the statute was enacted, Merriam-Webster defined "assessments" as "the action or an instance of assessing" or "the amount assessed." Merriam-Webster at 69. That dictionary defined "assess" in this context as "to determine the rate or amount of (as a tax)"; "to impose (as a tax) according to an established rate"; "to subject to a tax, charge, or levy"; and "to make an official valuation of (property) for the purpose of taxation." Id. Black's defined "assessments" "[i]n a general sense" as "the process of ascertaining and adjusting the shares respectively to be contributed by several persons towards a common beneficial object according to the benefit received," which "is often used in connection with assessing property taxes or levying of property taxes." Black's Law Dictionary at 77. Thus, these definitions support the County's

27

broad reading of the term "assessments."

However, if the General Assembly intended the term "assessments" to refer broadly to any kind of tax, the legislators' inclusion of the other specific items in the list in OCGA § 36-70-24 (3) (B) would be surplusage, and, again, courts generally strive to avoid a construction that "makes some language mere surplusage." *Camden County*, 315 Ga. at 509 (2) (b) (citation and punctuation omitted). Moreover, the text adopted in the Special Districts Paragraph of the Georgia Constitution supports that "assessments" are different in kind from "taxes" and "fees," as, otherwise, there would have been no need to list "fees, assessments, and taxes" separately and on equal terms in the constitutional text. Likewise, this Court has recognized that, as a general matter, assessments are different in kind from taxes. See *Hayden v. City of Atlanta*, 70 Ga. 817, 822-23 (1884) ("Taxes are different from assessments for local improvements, taxes being burdens upon all persons and property alike, and compensated for by equal protection to all, while assessments are not burdens but equivalents, and are laid for local

28

purposes upon local objects, and are compensated for to some extent in local benefits and improvements, enhancing the value of the property assessed. Taxes are imposed on the person, assessments are imposed on the property."). Accordingly, we construe the term "assessments" in OCGA § 36-70-24 (3) (B) as the act of charging a special payment but not to include fees and taxes. This construction would include "special assessments," but it is not limited to special assessments, as it could also include other assessments not classified as taxes or fees.

Therefore, we conclude that absent an agreement by the parties, OCGA § 36-70-24 (3) (B) limits the sources within a special district that can be used to fund services provided for the primary benefit of the unincorporated area of the county, that "property taxes" means ad valorem property taxes, and that "assessments" refer to any assessment that is not otherwise classified as a tax or fee, and we reverse the Court of Appeals on this ground.

3. Finally, we consider whether the superior court, which is conducting this proceeding under OCGA § 36-70-25.1 (d), has the

29

authority in such a proceeding to determine whether the City's usage rates charged to the Outside Customers constitute an illegal tax and whether the City is permitted to transfer profits from the excess fees collected from water service to Outside Customers into its general fund. We conclude that the superior court is not so authorized, and that it should have granted the City's motion to dismiss Count IV on this ground.

Our review of a trial court's decision on a motion to dismiss is de novo. See *Southern States Chem., Inc. v. Tampa Tank & Welding, Inc.*, 316 Ga. 701, 706 (1) (888 SE2d 553) (2023). The Act provides a detailed framework for local governments to use in negotiating and crafting their SDS Agreements and the processes and procedures that may be used in resolving any disputes. OCGA § 36-70-23 lists the four items that need to be included in every service delivery strategy,[17] while OCGA § 36-70-24 describes the criteria that must

---

[17] Under OCGA § 36-70-23:
> Each local government service delivery strategy shall include the following components:
>> (1) An identification of all local government services

30

be met in the development of a service delivery strategy. Specifically, OCGA § 36-70-24 (2) sets out requirements and procedures for strategies involving water or sewer services. Subparagraph (2) (A) of that statute provides "that water or sewer fees charged to customers located outside the geographic boundaries of a service provider shall not be arbitrarily higher than the fees charged to customers receiving such service which are located within the

presently provided or primarily funded by each general purpose local government and each authority within the county, or providing services within the county, and a description of the geographic area in which the identified services are provided by each jurisdiction;

(2) An assignment of which local government or authority, pursuant to the requirements of this article, will provide each service, the geographic areas of the county in which such services are to be provided, and a description of any services to be provided by any local government to any geographic area outside its geographical boundaries. In the event two or more local governments within the county are assigned responsibility for providing identical services within the same geographic area, the strategy shall include an explanation of such arrangement;

(3) A description of the source of the funding for each service identified pursuant to paragraph (2) of this Code section; and

(4) An identification of the mechanisms to be utilized to facilitate the implementation of the services and funding responsibilities identified pursuant to paragraphs (2) and (3) of this Code section.

geographic boundaries of the service provider." Subparagraph (2) (B) of the statute sets out a dispute resolution procedure for local governments to follow to challenge any alleged arbitrary rate differentials. That provision allows the contesting governing authority to hold a public hearing for the purpose of reviewing the rate differential. See OCGA § 36-70-24 (2) (B). And should the governing authority wish to pursue a challenge, it must have a qualified engineer prepare a rate study and engage in alternative dispute resolution before taking its challenge to "a court of competent jurisdiction." See id. As discussed above, OCGA § 36-70-25.1 (d) sets out the procedure for an aggrieved party to follow to petition the superior court for resolution of items "remaining in dispute."

Here, after presumably following the procedure laid out in OCGA § 36-70-24 (2) (B), the County filed its petition in this case pursuant to OCGA § 36-70-25.1 (d) (2) to resolve the parties' remaining disputes. Count II of the amended petition requests judicial resolution of the arbitrariness of the water rate differential

charged by the City to the Outside Customers, and Count III seeks a determination of whether the County had the authority to provide water service to all customers located in the unincorporated area of the County. These issues are clearly matters that must be addressed in negotiating a new SDS Agreement for the provision of water and sewage services, and thus disputes about such matters are considered issues "remaining in dispute" under the Act. See OCGA §§ 36-70-23; 36-70-24; 36-70-25.1 (d) (2).

However, Count IV seeks a determination as to whether the City's water charges constitute an illegal tax on the Outside Customers and whether the City could transfer profits collected from those customers to its general fund. These are not items that must be negotiated as part of an SDS Agreement, see OCGA §§ 36-70-23 and 36-70-24 (2), and thus cannot be considered items "remaining in dispute" under the statutory process outlined in OCGA § 36-70-25.1 (d). Because Count IV seeks a judicial determination that is beyond the scope of the Act, its requested relief falls outside the statutory dispute process contemplated by OCGA §

33

36-70-25.1 (d) (2). See *City of Union Point v. Greene County*, 303 Ga. 449, 459 (2) (812 SE2d 278) (2018) (superior court "is not authorized to grant relief pursuant to OCGA § 36-70-25.1 beyond the scope of the remedies made available in that Code section"), disapproved of on other grounds by *City of College Park v. Clayton County*, 306 Ga. 301 (830 SE2d 179) (2019).

Accordingly, the superior court should have dismissed Count IV, and we reverse the portion of the Court of Appeals's judgment affirming the trial court's order denying the City's motion to dismiss.[18]

*Judgment reversed and case remanded. All the Justices concur, except Boggs, C. J., not participating.*

BETHEL, Justice, concurring.

I agree with the analysis and conclusion of the opinion of the Court and join it in full.

---

[18] However, we note nothing in this opinion prevents the County from seeking declaratory, or other, relief on these issues in a separate proceeding.

I write separately to provide additional discussion of the considerations included in making the factual determination of whether a particular service is provided "primarily for the benefit" of an unincorporated area of a county as discussed in Division 1. See Maj. Op. at 559. In assessing the totality of the circumstances surrounding the service's provision, a superior court should contemplate the possibility that the service, though located outside the municipal limits and most frequently used by residents of the unincorporated area, nevertheless has no evident *primary* beneficiary and, instead, benefits the public broadly. Regardless of any geographical assessment of the location of the capital infrastructure of a particular service and without regard to its most frequent users, many services by their very nature transcend the assignment of a primary beneficiary.

Thinking of this question as lying on a spectrum may be helpful. On one end of the spectrum, services exist that are easily identified as being provided for the primary (and perhaps even exclusive) benefit of unincorporated area(s). These services might

35

include curbside rubbish collection exclusively from residences outside incorporated limits or a fire service whose coverage area is exclusively outside the incorporated limits. On the other end of the spectrum, however, are services that are rendered to the public without respect to municipal boundaries. Here, we might find, for example, a county-wide police department or the core functions of a county courthouse. Where a service is provided and who it most frequently serves are clearly relevant factors. But while they may seem determinative at the extremes of the spectrum, they are not determinative in a totality of the circumstances analysis.

Consider, for example, a few hypothetical services provided in imaginary Georgia counties. The first county provides potable water service to all residents. The capital infrastructure, excluding distribution pipes within the municipal boundaries, lies completely in the unincorporated area of the county while less than ten percent of county residents live inside the municipal boundary. Thus, while consideration of where the capital assets lie and the numerical utilization of the service might suggest that this service was

primarily for the benefit of the unincorporated area, the very nature of the service makes clear that the service is delivered to and equally benefits all county residents. The second county constructs a large regional recreational facility in an unincorporated area. The park is far more accessible to county residents of the unincorporated area, who are the primary local users of its amenities. But the park is frequently used to host tournaments and festivals that draw visitors to the community from other counties. These visitors frequent retail shops, restaurants, and hotels which are almost exclusively located inside municipal boundaries. Here again, the question of primary benefit would be incomplete if we considered only the location of the service and frequency of use as between residents of the incorporated and unincorporated portions of the county.

In sum, I believe the Court has correctly identified the challenge as requiring an analysis of the totality of the circumstances. For many services, this may be a relatively easy task (but it seems unlikely that the truly easy ones will evade resolution by the municipal and county governments prior to judicial

consideration). It may well be that most of these decisions will turn on the location of the service provision or the frequency of utilization, as seems to be the primary thrust of the municipality's argument in this case. Nevertheless, I view the nature of the service provided as a critical, though not dispositive, consideration in the primary beneficiary inquiry — a consideration that may be particularly apt in the context of the case at hand. A municipality that is logistically cut off from the surrounding environment at the city limits would not long survive. Any consideration of the beneficiaries of a transportation system in and through the unincorporated portions of a county would be incomplete without an assessment of the value derived by the municipality from being connected to the larger world.

Decided March 5, 2024.

Certiorari to the Court of Appeals of Georgia — 365 Ga. App. 832.

*Troutman Pepper Hamilton Sanders, Harold D. Melton; Smith Welch Webb & White, Andrew J. Welch III, Warren M. Tillery, Brandon F. Palmer, Grant E. McBride; Stell Smith & Mattison, John E. Stell, Jr.*, for appellant.

*Jarrard & Davis, Angela E. Davis, G. Aaron Meyer*, for appellee.

*Rusi C. Patel, Ryan R. Bowersox, Kevin H. Jeselnik; Washington Dreyer & Associates, Quinton G. Washington, David N. Dreyer; Alston & Bird, Keith R. Blackwell; Larry W. Ramsey, Jr., G. Joseph Scheuer; Jeffrey S. Akins; Opie D. Bowen; Jarrard & Davis, Kenneth E. Jarrard, Angela E. Davis, Patrick D. Jaugstetter, G. Aaron Meyer; Michael P. Ludwiczak; Nancy L. Rowan; Elliott Blackburn, Walter G. Elliott; Horne & Edelberg, Joy Edelberg; Lawrence A. Stockton, Jr.; David D. Gottlieb*, amici curiae.