NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 28, 2025

S24G0314. WALTON ELECTRIC MEMBERSHIP CORPORATION et al. v. GEORGIA POWER COMPANY.

S24G0318. NESTLE PURINA PETCARE COMPANY et al. v. GEORGIA POWER COMPANY.

MCMILLIAN, Justice.

In 2019, Nestle Purina Petcare Company attempted to switch its electric supplier for its wet-food manufacturing and distribution facility in Hartwell, Georgia from Georgia Power Company to Walton Electric Membership Corporation. Georgia Power objected under the Territorial Electric Service Act, OCGA §§ 46-3-1 et seq. ("Territorial Act"), asserting that it had the right to continue servicing the premises because they were not new premises and Nestle did not meet the requirements of the Territorial Act to switch electric suppliers. Specifically, Georgia Power argued that the premises had long existed as a manufacturing and warehousing

facility, that the premises continued to be a manufacturing and warehousing facility, and that the changes Nestle made to the facility did not "destroy[] or dismantle[]" the premises in whole as required by the Territorial Act to switch providers. OCGA § 46-3-8 (b). The Georgia Public Service Commission (the "Commission") rejected Georgia Power's argument, concluding that the premises were "destroyed or dismantled" and that they were not "reconstructed . . . in substantial kind," so Nestle was permitted to switch to Walton EMC under subsection (b). On appeal, the superior court reversed, concluding that the premises were not "destroyed or dismantled," and the Court of Appeals affirmed. *Walton Elec. Membership Corp. v. Ga. Power Co.*, 369 Ga. App. 461 (893 SE2d 852) (2023). We conclude that under the appropriate standard of review – abuse of discretion – the Commission's decision should have been upheld, so we reverse.

In 2017, Nestle purchased and renovated a former warehouse and textile manufacturing facility in Hartwell, Georgia to manufacture and process pet food. The premises are located in

2

Georgia Power's assigned supply territory pursuant to the Territorial Act, and Georgia Power has provided electrical service to the premises since they were built in 1991 as a textile manufacturing and warehouse facility. The facility was expanded at various points and totaled approximately 550,000 square feet by 1999. In 2006, the premises ceased being used for textile manufacturing and remained vacant for the next decade until some of the space was leased to several companies for warehousing space. Nestle then purchased the premises for $7 million and overhauled the facility so that it could be used to make pet food. In 2019, Nestle indicated its intention to switch its service provider to Walton EMC, pursuant to an exception in the Territorial Act for premises that have a single-metered service and connected load of 900 kilowatts or greater, which have been "destroyed or dismantled" and not "reconstructed . . . in substantial kind." OCGA §§ 46-3-8 (a) (5); 46-3-8 (b). Georgia Power objected and filed a complaint with the Commission, arguing that OCGA § 46-3-8 (b) entitled Georgia Power to continue serving the premises.

The Commission hearing officer's initial decision, which was adopted and affirmed in its entirety by the full Commission, concluded that Nestle was entitled to switch providers because its "substantial modifications" had "destroyed or dismantled" the premises, and they had not been "reconstructed . . . in substantial kind." The decision noted that the hearing officer heard two days of live testimony from multiple witnesses called by the parties and accepted dozens of exhibits from the parties.

Under the heading "Findings of Fact," the decision summarized the testimony, evidence, and contentions of the parties before stating:

> The Hearing Officer finds that Nestle removed and replaced the electrical system and infrastructure; removed and replaced 30 percent of the flooring and foundation in its food processing area; removed concrete slabs in the old weave room; changed the foundation in the old bleachery by filling the old vats with concrete and the old pits with ballast, structural steel, and concrete; removed the roof above the old bleachery, the old tank building, and some of the distribution center; demolished the old filter press' structural piers; demolished and removed the old air washing pits; and demolished the old crane system. Nestle Purina has swallowed up the old ventilation tunnels; some interior and exterior walls; and

4

replaced the old air plenum where the new office space sits. Additionally, Nestle Purina demolished interior walls, made openings in other walls, and is enclosing some exterior walls with a new building.

The Hearing Officer further finds that Nestle has committed $220 million to prepare the Hartwell Pet Food Facility for startup in the fall of 2019, and an additional $80 million to reach initial full operation by the second quarter of 2020. Nestle Purina has: (1) replaced the wastewater treatment facility, (2) changed the overall structure and design of the existing facility, (3) constructed approximately 120,00 [sic] square feet of additional buildings, (4) replaced the existing electrical systems, (5) replaced the air handling systems, and (6) created a food safe environment by, among other things, sealing off and otherwise protecting the interior from pests and other contaminants, and (7) added a freezer in one of the new buildings.

Based on these factual findings, the Commission determined that the premises were "destroyed or dismantled" as those terms were defined by dictionaries and Commission precedent. Moreover, the Commission concluded that the premises were not reconstructed in substantial kind because "[t]here are countless differences between the [textile facility] and Nestle['s pet food processing facility] in terms of both physical appearance and structure, and primary purpose and function."

After Georgia Power filed a petition for judicial review in the superior court pursuant to the Administrative Procedure Act, OCGA § 50-13-19 (a),[1] the superior court reversed the Commission's decision, concluding, "[t]he hearing officer's findings of fact . . . are clearly supported by the evidence," but "the PSC's determination that these modifications subjected the premises to [OCGA § 46-3-8 (b)] was clearly erroneous. . . . The Court finds as a matter of law that renovating portions of the premises does not constitute 'ruining,' 'demolishing,' or 'disassembling' in any regard." Moreover, the superior court found "that even if the renovations could be construed as a 'dismantling,' they were certainly reconstructed in substantial kind" because "[n]otwithstanding the extensive modifications that were completed to make the premises compatible with hygienic food processing, the purpose of the premises [as 'a warehouse and processing facility'] and layout remains

[1] OCGA § 50-13-19 (a) provides that "[a]ny person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter."

6

substantially the same."

The Court of Appeals affirmed, see *Walton Elec. Membership Corp.*, 369 Ga. App. at 466 (2), concluding that the superior court did not err in finding that for subsection (b) to apply, Nestle would have to take apart, disassemble, or ruin completely the premises "in a wholistic rather than partial manner," because subsection (b) "speaks to a *reconstruction* of the premises, which naturally contemplates the premises as a whole, and there is nothing in the plain language of the statute suggesting that" the exception applies to partial reconstruction. Id. at 464-65 (1). Citing prior precedent from this Court, as well as its own precedent, the Court of Appeals reasoned that this Court has cautioned that legislative exemptions in statutes are to be strictly construed. See *Jackson Elec. Membership Corp. v. Ga. Pub. Svc. Comm.*, 294 Ga. App. 253, 258 (3) (668 SE2d 867) (2008); *Sawnee Elec. Membership Corp. v. Ga. Pub. Svc. Comm.*, 273 Ga. 702, 704 (544 SE2d 158) (2001). The Court of Appeals also explained that to find that a partial modification of the premises entitles a customer to switch electric

suppliers would frustrate the intent of the Territorial Act.[2] *Walton*

*Elec. Membership Corp.*, 369 Ga. App. at 465 (1).

We granted certiorari and posed three questions:

> 1. Did the Court of Appeals err in interpreting "destroyed or dismantled" and "reconstructed . . . in substantial kind" as used in OCGA § 46-3-8 (b)?
>
> 2. What standard of review applies to the review of the Public Service Commission's determination of whether the premises were destroyed or dismantled under OCGA § 46-3-8 (b)? See, e.g., *Premier Pediatric Providers, LLC v. Kennesaw Pediatrics, P.C.*, 318 Ga. 350 (898 SE2d 481) (2024) (describing different standards under which mixed findings of law and fact are reviewed); *Efficiency Lodge, Inc. v. Neason*, 316 Ga. 551 (889 SE2d 789) (2023) (same).
>
> 3. Applying the appropriate standard of review, were the trial court's conclusions here correct?

1. Turning first to the question of what standard of review applies to the review of the Commission's determination of whether the premises were "destroyed or dismantled" under OCGA § 46-3-8 (b), we start by setting out the standard for judicial review of

---

[2] Because it agreed with the superior court that the premises were not dismantled or destroyed, the Court of Appeals did not examine whether they were reconstructed in substantial kind.

administrative decisions in the Administrative Procedure Act, OCGA § 50-13-19 (h), which provides:

> The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by other error or law;
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

We have held under this provision that "[j]udicial review of an administrative decision requires the court to determine that the findings of fact are supported by 'any evidence' and to examine the soundness of the conclusions of law that are based upon the findings of fact," and that "[w]hile the judiciary accepts the findings of fact if there is any evidence to support the findings," "the court is statutorily required to examine the soundness of the conclusions of

9

law drawn from the findings of fact supported by any evidence, and is authorized to reverse or modify the agency decision upon a determination that the agency's application of the law to the facts is erroneous." *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 160-61 (3) (664 SE2d 223) (2008) (citing OCGA § 50-13-19 (h)).

However, neither OCGA § 50-13-19 (h), nor *Pruitt Corp.*, nor other similar cases involving judicial review of administrative decisions explicitly address the situation here where we have a mixed question of law and fact. We have, however, recently addressed this situation in other contexts. In *Efficiency Lodge, Inc. v. Neason*, 316 Ga. 551 (889 SE2d 789) (2023), we explained what constituted a mixed question of law and fact in that case:

> [T]he question whether a landlord-tenant relationship has been created is a mixed question of fact and law. The transfer of the right of possession is established by reference to historical facts—for example, evidence that a renter installed locks or put up a fence, or that the property owner told her he would allow her to live there. But the ultimate question is not merely what happened in the real world, but whether what happened is properly characterized as a "grant[ ]" and "accept[ance]" of "the right simply to possess and enjoy the use of" the property. OCGA § 44-7-1. Such questions, which require a nuanced

10

judgment whether given historical facts meet or add up to an abstract legal concept or standard—a "landlord-tenant relationship," or "adverse possession," or "domicile," for instance—are mixed questions of law and fact.

316 Ga. at 565 n.6 (2) (b) (ii). See also, e.g., *Premier Pediatric Providers, LLC v. Kennesaw Pediatrics, P.C.*, 318 Ga. 350, 355 (2) (898 SE2d 481) (2024) (explaining that whether there has been an unreasonable delay in the filing of the transcript for appeal is a mixed question of law and fact).

Such mixed questions of law and fact are generally reviewed for an abuse of discretion because the trial court is generally best suited to weigh the evidence presented to it and assess whether the legal standard has been met.[3] See *Premier*, 318 Ga. at 356-57 (2).

---

[3] As we explained in *Premier*,

[t]his is not to say that all mixed findings are reviewed for abuse of discretion. For instance, a "mixed question of constitutional law," even if "fact-intensive," generally calls for de novo review. *Efficiency Lodge,* 316 Ga. at 565 (2) (b) (ii) n.6 (889 SE2d 789) (punctuation omitted) (quoting *Lilly v. Virginia,* 527 U.S. 116, 136-137 (V) (119 SCt 1887, 144 LE2d 117) (1999) (reasoning that for "fact-intensive, mixed questions of constitutional law, ... independent review is necessary to maintain control of, and to clarify, the legal principles governing the factual circumstances necessary to satisfy the protections of the Bill of Rights" (cleaned up))).

318 Ga. at 356 n.3 (2).

But a litigant challenging a court's evaluation of such mixed predicate questions can "attack[] conclusions of law . . . or findings of fact . . . that are made along the way to the predicate findings," and "[t]hose subsidiary legal conclusions and factual findings are reviewed on appeal de novo and for clear error respectively, . . . and if error is found in reviewing those conclusions and findings, that informs the ultimate judgment whether the trial court abused its discretion in making the predicate findings," which "will generally not be disturbed as long as they are within the bounds of the law, based on 'correct,' 'relevant' facts, and within the range in which reasonable jurists could disagree."  Id.  This standard of review is consistent with OCGA § 50-13-19 (h) (6) (allowing reversal of agency determination under an "abuse of discretion" standard) and is also consistent with the standards enunciated in *Pruitt Corp*.

Here, while the issue of the meaning of "destroyed or dismantled" and reconstructed "in substantial kind" under OCGA § 46-3-8 (b) is a subsidiary question of law, and the issue of what renovations and modifications Nestle made to the premises is an

evidentiary question of fact, the ultimate issue of whether those evidentiary facts meet or add up to that legal standard as set forth in the statute is a mixed question of law and fact. And because this type of mixed question requires a nuanced, case-by-case characterization, assessment, or judgment of whether the given historical facts are properly characterized as meeting the legal standard of "destroyed or dismantled" and "reconstructed . . . in substantial kind," we conclude that this mixed question is reviewed for an abuse of discretion. See *Premier*, 318 Ga. at 355 (2) (applying abuse of discretion standard to mixed question of law and fact).

2. Having clarified the correct standard of review, we turn to the merits. We recognize that the issue of whether the premises were "destroyed or dismantled" and "reconstructed . . . in substantial kind," as posed in our first certiorari question, turns on the meaning of the relevant terms as used in OCGA § 46-3-8, and that is a subsidiary legal question that we review de novo. See *North American Senior Benefits, LLC v. Wimmer*, 319 Ga. 641, 644 (2) (906 SE2d 373) (2024).

13

"When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant." *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted). We therefore look to the text of the statute, give the language its plain and ordinary meaning, view it in the context in which it appears, and read it in its most natural and reasonable way, as an ordinary speaker of the English language would. See id. See also *Golden v. Floyd Healthcare Mgmt., Inc.*, 319 Ga. 496, 501 (3) (904 SE2d 359) (2024); *Synovus Bank v. Kelley*, 309 Ga. 654, 657 (1) (847 SE2d 592) (2020). "We determine the ordinary public meaning of legal text by considering the meaning the text had at the time it was enacted." *City of Winder v. Barrow County*, 318 Ga. 550, 555 (1) (899 SE2d 157) (2024). In so doing, we typically "refer to the rules of English grammar, inasmuch as those rules are the guideposts by which ordinary speakers of the English language commonly structure their words[.]" *State v. SASS Group, LLC*, 315 Ga. 893, 900-01 (2) (b) (885 SE2d 761) (2023) (citation and punctuation omitted). As

14

always, "context is a critical determinant of meaning." *McBrayer v. Scarbrough*, 317 Ga. 387, 394 (2) (d) (893 SE2d 660) (2023).

OCGA § 46-3-8 (a) (5) provides:

> Notwithstanding any other provision of this part, but subject to subsections (b) and (c) of this Code section, after March 29, 1973, service to one or more new premises . . . if utilized by one consumer and having single-metered service and a connected load which, at the time of initial full operation of the premises, is 900 kilowatts or greater (excluding redundant equipment), may be extended and furnished, if chosen by the consumer . . . (5) By any electric supplier if the premises are located outside the limits of a municipality.

OCGA § 46-3-8 (b), in turn, provides:

> Notwithstanding any other provision of this part, . . . every electric supplier shall have the exclusive right to continue serving any premises lawfully served by it on March 29, 1973, or thereafter lawfully served by it pursuant to this part, including any premises last and previously served by it which before or after March 29, 1973, have become disconnected from service for any reason, and including premises which before or after March 29, 1973, have been destroyed or dismantled and which are reconstructed after March 29, 1973, in substantial kind on approximately the same site.

It is undisputed that under the rules and regulations set forth in the Territorial Act, Nestle's premises are located within electric supplier

Georgia Power's assigned area and that the premises were not brand new such that Nestle had the right under OCGA § 46-3-8 (a) (5) alone to select any electric supplier. Instead, Nestle claims that the premises are deemed "new" under OCGA § 46-3-8 (a) & (b).

Although subsection (b) is drafted from the perspective of the electric supplier that has the exclusive right to continue serving the premises (here, Georgia Power), it must be read in conjunction with subsection (a), which permits a customer to select "any electric supplier" upon meeting several conditions including that the premises are "new." However, subsection (a) is explicitly made "subject to" subsection (b). Reading subsections (a) and (b) together, it follows that an electric supplier for an assigned area does *not* have the exclusive right to continue serving the premises if the premises have been "destroyed or dismantled" and though reconstructed, are not "reconstructed . . . in substantial kind." See *Crowder v. State*, 309 Ga. 66, 70-71 (2) (a) (844 SE2d 806) (2020) (reading related statutory subsections together in context). Such premises are treated as "new premises" under subsection (a), permitting a large-

16

load consumer to choose another electric supplier to service such premises pursuant to that provision. Therefore, whether Nestle may choose Walton EMC as its electric provider, as the Commission originally ruled, or whether Georgia Power is entitled to be Nestle's exclusive electric provider, as the superior court and the Court of Appeals ruled, depends on whether the subject premises were "destroyed or dismantled" and "reconstructed . . . in substantial kind" under the statute.

(a) Turning to the phrase "destroyed or dismantled," we acknowledge that the Territorial Act does not define those terms, so we must interpret that phrase according to its ordinary public meaning at the time the statute was enacted in 1973. See *Barrow County*, 318 Ga. at 555 (1). Relying on dictionaries,[4] the parties appear to be in agreement that the ordinary public meaning of "destroy" is "to ruin the structure, organic existence, or condition of,"

---

[4] "Dictionaries are often helpful in ascertaining the ordinary meaning of a word that is not defined in a statute, but they cannot be the definitive source of ordinary meaning in questions of textual interpretation because they are acontextual, and context is a critical determinant of meaning." *City of Winder*, 318 Ga. at 555 (1) (citation and punctuation omitted).

Webster's Third New International Dictionary, *Destroy*, 615, G. & C. Merriam Co., Springfield, MA (1969), "[t]o ruin completely; spoil" or "[t]o tear down or break up; raze; demolish."  The American Heritage Dictionary, *Destroy*, 358, American Heritage Publishing Co., Inc., New York, NY (1973).[5]

However, the parties depart on their understanding of the term "dismantled," with Georgia Power asserting that "dismantled" means wholesale destruction, and Walton EMC and Nestle arguing that the whole premises need not be destroyed for the premises to be "dismantled."  At the time OCGA § 46-3-8 (b) was enacted, Webster's Third New International Dictionary defined "dismantle" as

> 1: to strip or deprive of dress or covering: DIVEST, UNCLOAK  2: to strip of furniture and equipment or significant contents <~ a house that is to be razed> <~ a ship before scrapping it>; *specif*: to strip of guns, walls, and defenses <~ a fort> <~ a town>  3: to wear down: do away with: RAZE, DESTROY; *also*: ANNUL, RESCIND <~ price controls after the war>  4: to take to pieces: DISMOUNT **syn** see STRIP.

---

[5] The Commission also purported to apply dictionary definitions of "destroy" (without citations to which dictionaries): "to ruin completely; spoil; 2. To tear down or break up; demolish . . . ."

18

Webster's Third New International Dictionary, *Dismantle*, 651-52, G. & C. Merriam Co., Springfield, MA (1969). The American Heritage Dictionary defined "dismantle" as

> To strip (a house, for example) of furnishings or equipment. 2. To take apart; tear down. 3. To strip of clothing or covering. [Old French *desmanteler*: *des-*, from Latin *dis-* (removal) + *mantel*, MANTLE.].

The American Heritage Dictionary, *Dismantle*, 379, American Heritage Publishing Co., Inc., New York, NY (1973).

These definitions do not conclusively resolve the question of the extent of changes that must be made for the premises to be "dismantled," especially because at least one definition of "dismantle" includes the term "destroy." See Webster's Third New International Dictionary, *Dismantle*, 651-52, G. & C. Merriam Co., Springfield, MA (1969).[6] So we turn to the grammatical and statutory context for more clues, looking at the phrase "destroyed *or*

---

[6] See also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 422 (2012) (urging caution in using Webster's Third New International Dictionary "because of its frequent inclusion of doubtful, slipshod meanings without adequate usage notes").

dismantled." (emphasis supplied). We have long observed that "the word 'or' is generally used in a disjunctive sense to signal alternatives." *Ford Motor Co. v. Cosper*, 317 Ga. 356, 359 (2) (893 SE2d 106) (2023) (noting that "or" carries a "usual disjunctive sense"). There is nothing in the text of OCGA § 46-3-8 (b) that gives a clear indication that the usual disjunctive sense is not meant here. See *Gearinger v. Lee*, 266 Ga. 167, 169 (2) (465 SE2d 440) (1996).[7]

Georgia Power also argues that because the term "reconstructed" refers back to "dismantled," and because "reconstructed" means "to construct again," a premises has to be totally destroyed or dismantled to be "reconstructed." We do not find that argument persuasive because we do not see why a premises that is "dismantled" in substantial part cannot be "constructed again," at least as to the part that was dismantled. However, the phrase "reconstructed . . . in substantial kind" does indicate that the

---

[7] Georgia Power argues that the use of the past tense of "destroyed" and "dismantled" indicates that the two are "equivalencies describing the state of the premises, not alternatives." We disagree and do not see the tense of the words as a "clear indication" that the disjunctive was not intended here.

20

destruction or dismantling must at least be to a degree substantial enough that a reconstruction would be required to return the premises to "substantial kind." Accordingly, to give full effect to each word in the phrase "destroyed or dismantled," read in context, we conclude that "destroyed" refers to the complete ruination or tearing down or breaking down of the premises, while "dismantled" means something less, which may, for example, be accomplished by substantially taking apart or substantially stripping away a building's structural components, furniture, equipment, or other significant contents, without the added requirement of entire destruction.[8] See *Middleton v. State*, 309 Ga. 337, 342 (3) (846 SE2d 73) (2020) ("[C]ourts generally should avoid a construction that makes some statutory language mere surplusage.").

Georgia Power argues, however, that dismantled must be construed narrowly to mean wholesale destruction because "legislative exceptions in statutes are to be strictly construed and

---

[8] Relying on dictionary definitions and its own precedent, the Commission utilized similar definitions of these terms.

should be applied only so far as their language fairly warrants. All doubts should be resolved in favor of the general statutory rule, rather than in favor of the exemption." *Sawnee*, 273 Ga. at 704 (cleaned up).[9] While it is true that *Sawnee* enunciated this principle, it did so by recognizing that this principle is limited by what the statutory language "fairly warrants." Id. We thus read *Sawnee*'s admonition to "strictly construe" statutory exceptions as bounded by the plain language of the exception and only applying if there is an ambiguity after applying all tools of construction. As recently explained by the United States Supreme Court, statutory exceptions should be "read fairly, not narrowly, for they are no less part of Congress's work than its rules and standard—and all are worthy of a court's respect." *HollyFrontier Cheyenne Refining, LLC v.*

---

[9] Although *Sawnee* characterizes OCGA § 46-3-8 (a) as providing a statutory exception to allow "a consumer to choose an electric supplier different from the one assigned," some of us question whether that characterization is correct. *Sawnee*, 273 Ga. at 703. Moreover, the statute's reference to premises which "have been destroyed or dismantled and . . . reconstructed . . . in substantial kind" merely describes premises over which a supplier maintains exclusive service rights under OCGA § 46-3-8 (b), so it is not clear to some of us that the question about whether the premises do or do not meet that description is even a question about whether to apply a statutory exception.

22

*Renewable Fuels Assn.*, 594 US 382, 396 (2) (B) (141 SCt 2172, 210 LE2d 547) (2021) (cleaned up). This reasoning is consistent with how this Court construes legal text. See *Johnson v. State*, 304 Ga. 369, 372 (818 SE2d 601) (2018) ("Legislative exceptions in statutes should be interpreted according to the rules of construction . . . and applied only so far as their language fairly warrants.") (citation and punctuation omitted).

We hold therefore that the Court of Appeals erred in interpreting "destroyed or dismantled," as used in OCGA § 46-3-8 (b), to require the premises to be taken apart, disassembled, or ruined "in a wholistic rather than partial manner." 369 Ga. App. at 464.

(b) Turning now to the phrase "reconstructed . . . in substantial kind" as used in OCGA § 46-3-8 (b), we note, as an initial matter, that the Court of Appeals did not reach the question of whether the premises met this requirement because it affirmed based on its misinterpretation of "destroyed or dismantled." However, the Court of Appeals upheld the superior court's ruling,

which construed the meaning of "reconstructed . . . in substantial kind" and concluded that the Commission wrongly determined that the premises were not reconstructed in substantial kind.  Because this issue was decided by the superior court and is within the scope of our first certiorari question, it is ripe for our review.  See *Barnes v. Turner*, 278 Ga. 788, 790 (1) n.9 (606 SE2d 849) (2004).

Because the Territorial Act also does not define "reconstructed" or "in substantial kind," we start with the original public meaning of those terms at the time of its enactment, looking again to dictionaries contemporaneous with the enactment of the statutory language.  See *Barrow County*, 318 Ga. at 555. Webster's Third New International Dictionary defined "reconstruct" as "to construct again: . . . to build again: . . . to make over: . . . to put together again: . . ." Webster's Third New International Dictionary, *Reconstruct*, 1897, G. & C. Merriam Co., Springfield, MA (1969), and defined "substantial," in relevant part, as "something of moment: an important or material matter, thing, or part."  Id. at 2280.  The American Heritage Dictionary defined "reconstruct" quite simply as

24

"[t]o construct again," The American Heritage Dictionary, *Reconstruct*, 1089, American Heritage Publishing Co., Inc., New York, NY (1973), and defined "substantial," in relevant part, as "[c]onsiderable in importance, value, degree, amount, or extent: *won by a substantial margin.*" Id. at 1284.

We have no trouble concluding, nor do the parties disagree, that "reconstructed . . . in substantial kind" means reconstructed premises that are largely, but not wholly, of the same fundamental nature or quality as they were previously.[10] Accordingly, taken together, we construe the phrase "destroyed or dismantled and which are reconstructed . . . in substantial kind" in OCGA § 46-3-8 (b) as extending an electric supplier's exclusive right to continue serving premises if, among other things: (a) the premises are completely ruined or torn or broken down, *or* (b) short of entire destruction, the premises are substantially taken apart or the

---

[10] This construction is consistent with how the Commission and the superior court defined the phrase, although the superior court in applying that definition ultimately concluded that the premises were "reconstructed . . . in substantial kind."

25

premises' structural components, furniture, equipment, or other significant contents are substantially stripped away; *and* (c) the premises are constructed again largely, but not wholly, of the same fundamental nature or quality as they were previously.

3. We now turn to the third question posed on certiorari: whether the courts below erred in reversing the Commission's decision under the appropriate standard of review. As for the Commission's findings of fact, we conclude that they were supported by the evidence. Indeed, the superior court agreed that "[t]he hearing officer's findings of fact . . . are clearly supported by the evidence," and the Court of Appeals saw no error in those findings. See *Walton Elec. Membership Corp.*, 369 Ga. App. at 466 (2) ("[W]e find no evidence of the [superior] court substituting its findings for that of the Commission."). Those findings included that Nestle spent $300 million dollars (nearly 43 times the purchase price) changing the structure and design of the previous facility, adding exterior walls, removing interior walls, removing roofing, demolishing infrastructure and systems, removing some buildings in part or in

26

whole, constructing new buildings, replacing its wastewater treatment and drainage systems to be specific to Nestle's operations, replacing the electrical systems and infrastructure, replacing the air-handling systems with specialized systems for Nestle's operations, removing and replacing flooring and foundation, making various other additions specific for operating a wet-food processing center and creating a food-safe environment, installing all new equipment, and sealing off and filling in horizontal branch and vertical ducting systems with rebar and concrete.

However, as described above, the courts below erred in concluding that because there was not a wholesale ruin of the premises, they were not "destroyed or dismantled" under OCGA § 46-3-8 (b). Instead, applying the correct construction of "destroyed or dismantled," we have no difficulty determining that the Commission did not abuse its discretion in concluding that Nestle's premises were "destroyed or dismantled" given the factual findings about the substantial modifications to the premises and construction of new buildings. Moreover, despite Georgia Power's

27

arguments that the premises were reconstructed in substantial kind because the premises remained a manufacturing and warehousing facility, we see no abuse of discretion in the Commission's determination that "[t]here are countless differences between the [textile facility] and Nestle['s pet food processing facility] in terms of both physical appearance and structure, and primary purpose and function," such that the premises were not "reconstructed . . . in substantial kind." Accordingly, we conclude that the Court of Appeals erred in affirming the superior court's reversal of the Commission's decision.

*Judgment reversed. All the Justices concur, except Ellington and Colvin, JJ., not participating.*