**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0060
Tonya Monroe
v.
The State

On Appeal from the Superior Court of Fulton County
No. 18SC158564

Decided: April 21, 2026

LAND, Justice.

Tonya Monroe appeals her 2022 convictions for malice murder and related charges stemming from the death of her infant grandson, Kobe Shaw.[1] Monroe argues that the evidence was

---

[1] The crimes are alleged to have taken place on or about March 10, 2016. Monroe was first indicted on March 31, 2017, and was reindicted on April 6, 2018, by a Fulton County grand jury for malice murder (Count 1), felony murder (Counts 2 and 3), cruelty to children in the first degree (Count 4), and distribution of methamphetamine (Count 5). In May 2018, Monroe's first trial ended in a hung jury. At Monroe's second trial, from November 3 to 10, 2022, the jury found Monroe guilty of all charges. The trial court sentenced Monroe to life in prison without the possibility of parole for Count 1, 20 years in prison for Count 4 (to be served concurrently with Count 1), and 30 years in prison for Count 5 (to be served concurrently with Count 1). Counts 2 and 3 were vacated by operation of law.

Monroe filed a timely motion for new trial on December 5, 2022, and amended that motion through new counsel on October 20, 2023. After a hearing on February 14, 2024, the trial court denied the amended motion for new trial on December 30, 2024, and Monroe filed a timely notice of appeal. Monroe's appeal was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

constitutionally insufficient to support her convictions and that she was denied effective assistance of trial counsel in several respects. For the reasons that follow, we affirm.

1. The evidence presented at trial showed as follows. Kobe, who was nine months old at the time of his death on March 11, 2016, lived with his mother Taylor Shaw, his father Hayden Shaw, and his maternal grandmother, Monroe, in an apartment in Fulton County. At six months old, Kobe was diagnosed with a genetic disorder that caused severe underdevelopment of his brain and severely shortened his life expectancy. As a result of this disorder, Kobe was unable to roll, crawl, or reach and grab things, and he partially relied on a "g-tube" for feedings and medicine. However, Taylor and Hayden testified that at Kobe's last doctor's appointment about a week prior to his death, his doctor stated that Kobe was "looking really good and really healthy" and that they discussed removing his feeding tube.

On the evening of March 10, 2016, Kobe was "very fussy and … aggravated." Hayden went to the store and purchased mashed potatoes, lemonade, and teething gel for Kobe. Taylor gave Kobe the teething gel while Monroe prepared the mashed potatoes, and Taylor then fed Kobe the mashed potatoes. Kobe later fell asleep on Taylor's chest, and Taylor noticed that he was "sweating ... bad." Between 1:00 and 2:00 am on March 11, Hayden placed Kobe upright on a c-shaped "boppy" pillow inside his "pack and play" crib near his and Taylor's bed to sleep the rest of the night.[2]

Taylor and Hayden then fell asleep and woke up later that

---

[2] Taylor and Hayden testified that they used the pillow at the direction of Kobe's doctors to help minimize Kobe's acid reflux but that the pillow was never placed on Kobe's face. Hayden testified that Kobe also slept with his arms "wrap[ped]" in a blanket.

morning when Monroe came into their room saying that Kobe was "blue." Hayden picked up Kobe and started "patting him on the back." Taylor yelled at Monroe to call 911; Monroe did so. Emergency medical personnel and police officers arrived at the apartment, where they found Kobe in the pack and play and observed that he was "not breathing," had an "arched body," and was showing signs of rigor mortis, including discoloration. Monroe told police that, when she went into Taylor's and Hayden's bedroom and saw Kobe, he was "covered with a blanket mostly over [his] entire body" and "the boppy pillow was on top of [his] body nearest the head." Hayden told police that Monroe's statement that the pillow was over Kobe's face "was a lie" and he knew how Kobe "was sitting" because he "picked his son up."

Hayden testified at trial that he, his wife, and Monroe regularly used meth together, but denied ever using meth in Kobe's presence or giving him meth. Hayden testified that no one used meth on the day of Kobe's death because Monroe told him "there wasn't any" and that he last used drugs with Monroe and Taylor two days before Kobe died.

The State presented testimony from several expert witnesses whose testimony supported the State's theory that Kobe died from meth toxicity, including the testimony of two physicians who opined that meth caused Kobe's death.

Dr. Karen Sullivan, a forensic pathologist who served as the chief medical examiner for the Fulton County Medical Examiner's Office, supervised Kobe's autopsy and testified that she initially determined that Kobe's cause of death might be asphyxiation based on the information she received from investigators that Kobe was found with a blanket and pillow over his body. Medical examiners performed an in-house urine test, which did not test

3

positive for meth. As part of the autopsy, however, medical examiners took samples of Kobe's blood. Those samples tested positive for meth, revealing that Kobe's blood contained 8.6 nanograms of meth per milliliter while his serum/plasma sample contained 14 nanograms of meth per milliliter. Tissue samples from Kobe's lungs also revealed evidence of pneumonia, which Dr. Sullivan testified is "typical … in the lungs of a person who [has] died of an acute drug overdose." Dr. Sullivan testified that the positive blood test results caused her to revise her determination as to the cause of death with her ultimate conclusion being that he died from meth toxicity. Dr. Sullivan determined the manner of Kobe's death was a homicide because "the only way he could have gotten the [meth] was … if he was given it by someone else" as "he was unable to crawl, stand, [or] hold a bottle by himself."

Dr. Christy Cunningham, the forensic medical pathologist who conducted Kobe's autopsy, testified that meth can cause "sudden cardiac death" and that "anytime that you have the presence of an unexplained illicit drug in … [a] type of person that doesn't have … the ability to put those things there themselves," it is "considered contributory to death at that point." Dr. Cunningham testified that "there is no safe or therapeutic level of certain drugs such as [meth]" and based her opinion that meth caused Kobe's death, in part, on "volumes" of cases she had reviewed in scientific literature and "major pediatric forensic pathology textbooks."

Dr. Gaylord Lopez, a pharmacist with specialty training in clinical toxicology and the executive director of the Georgia Poison Center, testified that meth was "without a doubt … an accelerant" to Kobe's death. Dr. Lopez further testified that, based on his review of Kobe's bloodwork and scientific literature, the level of meth in Kobe's body was consistent with "direct administration" of meth to Kobe, not secondary exposure. Dr. Lopez also testified

4

to his opinion that Kobe's exposure to the meth was recent because there was "no presence or measurable amount of the primary breakdown product of [meth], which is amphetamine." He testified that he believed this was because Kobe's "body had not had time to break that product down to a level that was quantifiable."

A warrant was issued for Monroe's arrest on June 15, 2016. Monroe could not be located for approximately one month, during which time she stayed at several different residences, including one residence in Alabama, disabled the GPS tracker on her vehicle, altered her appearance, and used false names. One witness testified at trial that Monroe stayed at his home for three days in July 2016, during which she told him that all Kobe did was "squall and squall and squall, and the only way to calm [him] down was to blow [him] hot rails."[3] Monroe's friend, who was also her cellmate prior to Monroe's trial, testified that Monroe told her that Kobe "wouldn't stop" crying and admitted to putting meth in his mouth the night he died.

2. Monroe argues that the evidence was constitutionally insufficient to support her convictions. Specifically, she argues that the evidence is insufficient to sustain her conviction for malice murder because the State failed to prove that meth caused Kobe's death or that she provided any meth to him. She also argues that the evidence is insufficient to sustain her convictions for cruelty to children in the first degree and distribution of meth because the State failed to prove that she "distributed" meth as defined in OCGA § 16-13-21. We are unpersuaded.

---

[3] A police officer testified that "hot rails" are when "you cut a line of crystal meth," "heat the end of [a] glass straw," and "stick the end of the glass [straw] up your nose and you snort the crystal [meth]" so that the meth "goes from a solid state to a gas state immediately" and you "inhale the fumes."

"When evaluating challenges to the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jackson v. State*, 311 Ga. 626, 629 (2021) (citation and punctuation omitted). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." Id. at 630 (citation and punctuation omitted). When we review evidence for constitutional sufficiency, we consider "all evidence, whether admissible or not." *Thomas v. State*, 310 Ga. 579, 580 (2020) (citation and punctuation omitted).

a. Here, viewing the evidence in the light most favorable to the verdict, a jury could have found Monroe guilty beyond a reasonable doubt of malice murder. The State presented testimony from several expert witnesses who concluded that meth caused or contributed to Kobe's death. And the State likewise presented sufficient evidence that Monroe gave Kobe the meth that killed him, as Monroe's friend and cellmate testified that Monroe admitted she put meth in Kobe's mouth the night he died, testimony which was corroborated by Dr. Lopez's testimony that the level of meth in Kobe's body was consistent with direct administration (as opposed to secondary exposure), which could only be done by another person given Kobe's condition. This evidence is sufficient to support Monroe's conviction. See *United States v. Benjamin*, 958 F3d 1124, 1132 (11th Cir. 2020) (concluding evidence was sufficient for a jury to find that fentanyl distributed by the defendant was a "but-for cause" of the victim's death).

b. Monroe argues the evidence is insufficient to sustain her

6

convictions for distribution of meth under OCGA § 16-13-30 and cruelty to children predicated on distribution of meth because the State failed to prove that Monroe "distributed" meth as defined in the statute. We disagree.

In pertinent part, OCGA § 16-13-30(b) makes it "unlawful for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance," including meth. See OCGA § 16-13-26(3)(B) (defining "[a]ny substance which contains any quantity of [meth]" as a Schedule II controlled substance). "Distribute" is defined as "to deliver a controlled substance, other than by administering or dispensing it," and "deliver" is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance."[4] OCGA § 16-13-21(11), (7). Thus, to be criminally liable for distribution of meth under OCGA § 16-13-30(b), a defendant must make an "actual, constructive, or attempted transfer" of meth to another person.

Relying on *Glispie v. State*, 300 Ga. 128 (2016), Monroe contends that this definition of "distribute" only contemplates the sale of drugs.[5] Monroe's interpretation of our holding in *Glispie* is

---

[4] Monroe did not "administer" meth under OCGA § 16-13-21(1) because the statute defines "administer" as the "direct application" of a controlled substance by a "practitioner or … authorized agent" or by the "patient or research subject at the direction and in the presence of the practitioner." There is no evidence in the record that Monroe was a "practitioner" or "authorized agent"; thus, administration under OCGA § 16-13-21 does not contemplate the activity alleged to have taken place here.

[5] Monroe specifically relies on the following language from *Glispie* to argue that a "distribution" only contemplates sales activity:

incorrect, however, because we did not hold or even suggest in that case that a distribution of a controlled substance only occurs when a defendant attempts to sell that substance. See id. at 131–32 (contents of defendant's pockets were "consistent with an intent to sell *or* distribute" drugs (emphasis supplied)). Moreover, there is nothing in the statutory text that supports Monroe's contention, and we must apply that text as it is written. See *Allen v. Wright*, 282 Ga. 9, 12 (2007) ("[T]he doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature. We can not add a line to the law." (citation omitted)).

While we have not previously determined whether the definition of "distribute" under OCGA § 16-13-30(b) encompasses the type of activity at issue here, placing meth in a baby's mouth and/or causing a baby to ingest the fumes of heated meth, we have no problem concluding that it does. In interpreting the language of a statute, we generally presume

> that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in

Here, Glispie had an assortment of drugs and drug paraphernalia in his pocket at the time that he was arrested. Officers familiar with the drug trade testified that the amount of crack cocaine, the drugs' packaging, possession of more than one cell phone, possession of cash in small denominations, and absence of a device to ingest crack with were all consistent with an intent to sell or distribute[.]

300 Ga. at 131–32.

8

its most natural and reasonable way, as an ordinary speaker of the English language would .... [And] if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.

*White v. State*, 305 Ga. 111, 114–15 (2019) (citation omitted). Here, a natural reading of the text of the statute indicates that a "distribution" of meth as contemplated in OCGA § 16-13-30 does not occur only when there is a sale of meth because the statute makes it "unlawful for any person" to "distribute" *or* "sell" a controlled substance. *Walton Electric Membership Corp. v. Georgia Power Co.*, 320 Ga. 740, 747 (2025). If "distribution" of a controlled substance only occurred when it was sold, it would not make sense for the statute to separately list "selling" a controlled substance as a criminal offense. See *Camden County v. Sweatt*, 315 Ga. 498, 509 (2023) ("[I]t is well settled that in interpreting statutory text, courts generally should avoid a construction that makes some language mere surplusage." (cleaned up)). This interpretation is consistent with how our Court of Appeals has interpreted this provision. See, e.g, *Capers v. State*, 273 Ga. App. 427, 428 (2005) ("[T]he offense of distribution of cocaine does not require that the offender receive a payment."); *Dorsey v. State*, 212 Ga. App. 479, 480 (1994) ("[A] sale is a distribution by definition, although a distribution may or may not be a sale."); *State v. Luster*, 204 Ga. App. 156, 158 (1992) (defining "deliver" as "[t]o give or transfer; to yield possession or control of; to part with (to); to make or hand over; to make delivery of").

Thus, the definition of "distribute" covers more than just selling a controlled substance because it encompasses "the actual, constructive, or attempted transfer from one person to another of a controlled substance." OCGA § 16-13-21(11). Accordingly, we

conclude that distribution under OCGA § 16-13-30(b) does not require a sale to occur and can occur when an individual intentionally transfers a controlled substance to another individual. There was evidence presented to the jury in this case that Monroe did just that, as Monroe told a friend that she placed meth in Kobe's mouth the night he died and told another witness that the only way to calm Kobe down was to blow him "hot rails." Accordingly, we reject her argument that the evidence was insufficient to support the jury's verdict.

4. Monroe argues that her trial counsel rendered ineffective assistance by (a) failing to object to the admission of Kobe's blood test results, (b) failing to object to testimony from the State's experts as to Kobe's cause of death, (c) failing to request a limiting instruction as to testimony of Monroe's parole officer, and (d) failing to question Taylor about Hayden's drug use on the day of Kobe's death. These claims fail.

A defendant claiming ineffective assistance of counsel must prove deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To prove deficient performance, a defendant must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. This requires Monroe to "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Wilson v. State*, 313 Ga. 319, 322 (2022) (citation and punctuation omitted).

"An attorney's decision about which defense to present is a question of trial strategy." *Hendrix v. State*, 298 Ga. 60, 62 (2015) (citation and punctuation omitted). "Unless the choice of strategy

is objectively unreasonable, such that no competent trial counsel would have pursued such a course, we will not second-guess counsel's decisions in this regard." Id. See also *Hurt v. State*, 298 Ga. 51, 57 (2015) ("If a reasonable lawyer might have done what the actual lawyer did—whether for the same reasons given by the actual lawyer or different reasons entirely—the actual lawyer cannot be said to have performed in an objectively unreasonable way."). And "[i]mportantly, in the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." *Wilson*, 313 Ga. at 322 (citation and punctuation omitted). "To show prejudice, [the appellant] must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Palmer v. State*, 303 Ga. 810, 816 (2018). "If either *Strickland* prong is not met, this Court need not examine the other prong." Id. at 816.

a. Monroe argues that her trial counsel rendered ineffective assistance by failing to object to the admission of the blood test results on chain-of-custody grounds. We are unpersuaded.

"When blood samples are handled in a routine manner and nothing in the record raises a suspicion that the blood sought to be admitted is not the blood tested, the blood is admissible and the circumstances of each case need only establish reasonable assurance of the identity of the sample." See *Johnson v. State*, 271 Ga. 375, 382 (1999) (cleaned up). Here, trial counsel chose not to challenge the chain of custody of the blood but instead focused on two theories of defense: either the quantity of meth in Kobe's system was insufficient to kill him, or Kobe ingested the meth "passively" by simply "being around it." At the hearing on Monroe's motion for new trial, Monroe's trial counsel testified that he "considered" whether he could exclude the results of the blood tests at

11

trial but "did not see" a way to do so, particularly given that chain of custody issues "go[] more to … weight [of the evidence] than admissibility." (cleaned up).

As trial counsel correctly noted, "[challenges] to the chain of custody [go] to the weight rather than the admissibility of the evidence." *McDowell v. State*, 309 Ga. 504, 507 (2020) (citation and punctuation omitted). "When there is only a bare speculation of tampering, it is proper to admit the evidence and let what doubt remains go to the weight." *Hurst v. State*, 285 Ga. 294, 296 (2009). Here, there was no evidence that the blood samples had been the subject of tampering. Monroe's only argument on that issue is that tampering could be inferred from the fact that the in-house urine drug test came back negative while the blood tests came back positive for meth. This argument is meritless, as the evidence revealed that the two types of tests at issue (urine and blood) were different tests and that the alleged "discrepancy" in the results was explained by the nature of the tests and not tampering. »Accordingly, we cannot say that trial counsel's decision not to object to the chain of custody of the blood samples was objectively unreasonable. Counsel's actions were not deficient, and this claim fails.

b. Monroe argues that trial counsel rendered ineffective assistance by failing to object to the State's expert witnesses' opinions as to Kobe's cause of death under *Daubert*[6] because those opinions were not based on reliable scientific principles and methods. We disagree.

Under OCGA § 24-7-702, which adopts the standard set forth in *Daubert*,

---

[6] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579 (1993).

12

a trial court must evaluate the reliability of the expert's proffered testimony; proper considerations include whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

*Smith v. State*, 315 Ga. 287, 300 n.6 (2022) (citation and punctuation omitted).[7] *Daubert*'s reliability inquiry is "flexible," with the specific factors "neither necessarily nor exclusively applying to all experts in every case." *HNTB Georgia, Inc. v. Hamilton-King*, 287 Ga. 641, 643 (2010) (citing *Kumho Tire Co. v. Carmichael*, 526 US 137, 141 (1999)).

In the context of ineffective assistance of counsel claims, trial counsel's decisions on

how to respond to the presentation of an expert witness by the opposing side, such as whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy that, if reasonable, cannot successfully establish a claim of ineffective assistance of counsel.

---

[7] OCGA § 24-7-702 extends the *Daubert* standard to criminal trials commenced on or after July 1, 2022. *Hayes v. State*, 320 Ga. 505, 516 (2024). Monroe's trial commenced in November 2022.

*McIver v. State*, 321 Ga. 565, 569–70 (2025) (citation and punctuation omitted).

Here, the record demonstrates that Monroe's trial counsel thoroughly cross-examined each of the State's expert witnesses in an attempt to show the weakness of their opinions. And, a reasonable attorney could conclude that this cross-examination was effective, as appellate counsel later concluded that there was no need to call these experts at the motion for new trial hearing because the experts were "repeatedly asked to give the scientific bases of their determinations and were unable to do so" and "[t]here is no reason to think this testimony would have changed had the experts been recalled to the motion for new trial hearing." Moreover, trial counsel presented his own rebuttal expert in support of Monroe's defense, Dr. James Downs, who testified that he did not see a set of symptoms in Kobe that would indicate meth toxicity, that he was unaware of any child who died due to a level of meth that was "this low," and that he believed that Kobe died either as a result of his genetic disorder or from undetermined causes.

Here, in light of the testimony given by the State's experts, which included their explanations of how their opinions were supported by the medical literature and their own experience, we cannot say that no objectively reasonable attorney would have foregone a *Daubert* motion and instead chosen to rely on a thorough cross-examination and the presentation of a rebuttal expert. Accordingly, Monroe's claim that trial counsel's performance was deficient fails. See *Treadaway v. State*, 308 Ga. 882, 892 (2020) (no deficient performance in failing to call a rebuttal expert when trial counsel instead decided to "destroy" the State's expert on cross-examination and the record reflected that cross-examination was "thorough and sifting"); *Birdow v. State*, 305 Ga. 48, 52–53 (2019) (no deficiency in failing to call an opposing expert when

counsel reasoned that the "same conclusions" that experts would testify to could be drawn out in cross-examination). See also *Gawlak v. State*, 310 Ga. App. 757, 759 (2011) (no deficient performance because the decision not to call a rebuttal expert and instead to rely on cross-examination was a matter of trial strategy); *Al-Attawy v. State*, 289 Ga. App. 570, 573–74 (2008) ("Not objecting to testimony but instead subjecting it to cross-examination may be part of a reasonable trial strategy.").[8]

c. Monroe argues that her trial counsel rendered ineffective assistance by failing to request a limiting instruction for the trial testimony of Monroe's parole officer, after the court had indicated it would provide one if requested. This enumeration fails.

Prior to trial, Monroe's trial counsel filed a motion to exclude the testimony of her parole officer, Wayne Dyer, who the State intended to call as a witness to establish that Monroe used meth the day of Kobe's death and that Monroe fled following her making of this confession to Dyer. Monroe argued that calling Dyer as a witness would necessarily imply to the jury that Monroe was a convicted felon. The trial court withheld its ruling, indicating that it believed Dyer's testimony was intrinsic because it explained why Monroe was "making these statements [regarding her meth use] to the parole officer" but that it "would be more than happy to do a stern limiting instruction to the jury that they can't take it into consideration." At trial, the State called Dyer as a witness, and trial counsel did not request a limiting instruction.

---

[8] We acknowledge that these decisions were all rendered prior to Georgia's adoption of the *Daubert* standard in criminal cases. Nonetheless, their holdings are persuasive and show that an attorney's decision to forgo a possible objection to expert testimony in lieu of vigorous cross-examination and the presentation of rebuttal expert testimony is a classic strategic decision that we will not lightly second-guess when evaluating an ineffective assistance of counsel claim.

15

Dyer testified that when Monroe met with him on March 12, 2016, he was "shocked" by her appearance, that she appeared to be "on substance abuse," and that after Dyer told her he "was going to do a drug screen," Monroe admitted to using "meth about two days" earlier. Monroe then "fled" after speaking to Dyer.

During the motion for new trial hearing, trial counsel testified that he did not have a reason for failing to request a limiting instruction but he elected to "[lean] into" Dyer's testimony to "explain [Monroe's] flight" for the month prior to her arrest. Because Dyer's testimony tended to show that Monroe could have fled because she was in trouble with her parole officer and not because of Kobe's death, and because a limiting instruction may have resulted in drawing extra attention to Monroe's criminal history, we cannot say that trial counsel's failure to request a limiting instruction was objectively unreasonable. Thus, Monroe has not shown that trial counsel performed deficiently under the circumstances. See *Davis v. State*, 306 Ga. 140, 148 (2019) ("A defendant who contends a strategic decision constitutes deficient performance must show that no competent attorney, under similar circumstances, would have made it." (citation and punctuation omitted)); *Phillips v. State*, 285 Ga. 213, 220 (2009) (trial counsel's decision not to request a limiting instruction was strategic because "he did not wish to draw attention to the prior convictions").

d. Monroe argues that her trial counsel rendered ineffective assistance by failing to question Taylor about Hayden's meth use in the apartment around the time of Kobe's death and to impeach Taylor with her testimony from Monroe's first trial that Hayden used meth the night after Kobe died. We disagree.

In advance of trial, the State filed a motion in limine to exclude hearsay testimony from Taylor implicating Hayden in Kobe's death. The trial court granted the State's motion, ruling

16

that if Monroe intended to present evidence that Hayden or anyone else caused Kobe's death, trial counsel was ordered "to bring this to the attention of the [c]ourt outside the presence of the jury and <u>prior</u> to asking such questions" so that the trial court could rule on its admissibility.

During trial counsel's cross-examination of Taylor, counsel asked her whether she had seen "Hayden with a large amount of [meth] on his person" on the day Kobe died. The State objected, and, outside of the presence of the jury, the court ruled that Monroe's trial counsel could ask Taylor whether she saw "meth in the apartment that day," and whether "she used [meth] with Hayden … in the weeks leading up to [Kobe's] death" but could not "introduce evidence implicating Hayden as the one who distributed the [meth]" to Kobe.

When the jury returned and trial resumed, the trial court instructed the jury to disregard trial counsel's last question. Trial counsel then asked Taylor whether she saw meth in the apartment "the day of Kobe's passing," and Taylor responded "yes." No further questions were asked concerning Hayden's alleged drug use on the day or night of Kobe's death.

"[T]he extent of cross-examination [is a matter] of trial strategy and tactics, and such strategic and tactical decisions do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances." *Washington v. State*, 294 Ga. 560, 566 (2014). And, generally, "[t]he decision whether to impeach a witness is a matter of trial strategy that typically will not support a claim of ineffective assistance." *Bryant v. State*, 306 Ga. 687, 697 (2019).

The record reflects that Monroe's counsel did question Taylor about the presence of meth in the apartment the day of

17

Kobe's death. Monroe provides no evidence suggesting that had her trial counsel questioned Taylor further, Taylor would have provided more specific and helpful information about meth use in the apartment the day of Kobe's passing.[9] See *Bonner v. State*, 314 Ga. 472, 476 (2022) (finding no deficient performance in failing to cross-examine a witness when the appellant "failed to demonstrate how cross-examination of these witnesses would have been helpful to him"). Monroe likewise points to no inconsistencies between Taylor's testimony during the first trial and her testimony during the second trial that would have allowed trial counsel to impeach her, nor does she establish how counsel would have been deficient in failing to impeach Taylor given his impression that Taylor was favorable to the defense. For these reasons, Monroe has failed to show that trial counsel performed deficiently.

e. Monroe argues that the cumulative effect of the alleged errors committed by her trial counsel and the trial court warrant a new trial. See *State v. Lane*, 308 Ga. 10 (2020). "In considering a claim of cumulative error, we evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors." *O'Neal v. State*, 316 Ga. 264, 271 (2023). Because none of Monroe's claims of error have succeeded and she has not shown that her counsel performed deficiently, "there are no errors to aggregate, and [her] claim of cumulative error also fails." Id.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

---

[9] At Monroe's first trial, Taylor testified that Hayden used meth the night of the 11th, *after* Kobe died. Kobe was found dead on the morning of the 11th.